**C.A. No. 18-17031**
**CAPITAL CASE**

D. Ct. No. CV-09-08089-PCT-DGC
Criminal Case No. CR-01-01062-PCT-DGC

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

LEZMOND C. MITCHELL,
AKA Lezmond Charles Mitchell,

Petitioner-Appellant,

v.

UNITED STATES OF AMERICA,

Respondent-Appellee.

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

# APPELLEE'S SUPPLEMENTAL EXCERPTS OF RECORD

MICHAEL BAILEY
United States Attorney
District of Arizona

KRISSA M. LANHAM
Deputy Appellate Chief

WILLIAM G. VOIT
Assistant U.S. Attorney
Two Renaissance Square
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4449
Telephone: (602) 514-7500
Attorneys for Appellee

Date Submitted via ECF: September 27, 2019

# TABLE OF CONTENTS


| | | Page Nos. |
|---|---|---|
| CV 56 | Memorandum of Decision and Order (excerpt), filed 09/30/2010, No. CV-09-08089-PCT-DGC | 1-2 |
| Dkt. No. 23 | Appellant's Opening Brief (excerpt), filed 06/27/2012, CA No. 11-99003 | 3-10 |
| | Reporter's Redacted Transcript of Proceedings – Jury Trial – Day 15, dated 04/30/2003 | 11-32 |
| | Reporter's Redacted Transcript of Proceedings – Jury Trial – Day 16, dated 05/01/2003 | 33-65 |
| | Reporter's Redacted Transcript of Proceedings – Jury Trial – Day 17, dated 05/02/2003 | 66-83 |
| | Reporter's Transcript of Proceedings – Jury Trial – Day 18, dated 05/06/2003 | 84-95 |
| | Reporter's Transcript of Proceedings – Jury Trial – Day 19, dated 05/07/2003 | 96-100 |
| | Reporter's Redacted Transcript of Proceedings – Jury Trial – Day 25, dated 05/16/2003 | 101-105 |
| | Reporter's Redacted Transcript of Proceedings – Jury Trial – Day 26, dated 05/20/2003 | 106-122 |

**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | | |
|---|---|---|
| Lezmond Mitchell,<br>Petitioner,<br>vs.<br>United States of America,<br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. CV-09-8089-PCT-MHM<br>No. CR-01-1062-PCT-MHM<br><u>DEATH PENALTY CASE</u><br>**MEMORANDUM OF DECISION AND ORDER** |

Petitioner Lezmond Mitchell, a federal prisoner under sentence of death, moves this Court to vacate his conviction and sentence under 28 U.S.C. § 2255. (Doc. 30.)[1] The Government filed a response opposing the motion, and Petitioner replied. (Docs. 49, 55.) After consideration of the motion and responsive pleadings, as well as the trial record and the numerous exhibits proffered by the parties, the Court concludes that Petitioner is not entitled to postconviction relief and that further evidentiary development is neither required nor warranted.

**<u>PROCEDURAL HISTORY</u>**

On May 8, 2003, a jury convicted Petitioner of first degree murder, felony murder,

[1] "Doc." refers to documents filed in the instant civil case. "CR Doc." refers to documents filed in the criminal case, No. CR-01-1062-PCT-MHM.

denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of the following claims:

> Claim A – Whether counsel's failure to investigate, prepare, and present evidence of intoxication resulted in ineffective assistance at trial;
>
> Claim B – Whether counsel's failure to investigate, prepare, and present evidence of addiction and intoxication resulted in ineffective assistance at sentencing; and
>
> Claim D – Whether counsel's failure to investigate, prepare, and present evidence of Mitchell's social history and executive functioning deficits resulted in ineffective assistance at sentencing.

For the reasons stated in this Order, the Court declines to issue a COA with respect to any other claims or procedural issues.

Based on the foregoing,

**IT IS ORDERED** that Petitioner's Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, Or, in the Alternative, Pursuant to 28 U.S.C. § 2241 (Dkt. 30) is **DENIED**. The Clerk of Court shall enter judgment accordingly and terminate this action.

**IT IS FURTHER ORDERED GRANTING** a Certificate of Appealability as to the following issues:

> Claim A – Whether counsel's failure to investigate, prepare, and present evidence of intoxication resulted in ineffective assistance at trial;
>
> Claim B – Whether counsel's failure to investigate, prepare, and present evidence of addiction and intoxication resulted in ineffective assistance at sentencing; and
>
> Claim D – Whether counsel's failure to investigate, prepare, and present evidence of Mitchell's social history and executive functioning deficits resulted in ineffective assistance at sentencing.

DATED this 30th day of September, 2010.

Mary H. Murguia
United States District Judge

CA NO. 11-99003

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| LEZMOND C. MITCHELL,<br>Petitioner-Appellant,<br>v.<br>UNITED STATES OF AMERICA,<br>Respondent-Appellee. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **<u>DEATH PENALTY CASE</u>**<br>DC No. CV 09-8089-MHM |

**APPELLANT'S OPENING BRIEF**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

SEAN K. KENNEDY
Federal Public Defender
STATIA PEAKHEART
JONATHAN C. AMINOFF
GIA KIM
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-4408

Attorneys for Petitioner-Appellant
LEZMOND C. MITCHELL

Mitchell seeks his first and only opportunity to make a record in federal court. Under this Court's pre-AEDPA precedent, "in a capital case, a habeas petitioner who asserts a colorable claim to relief, and who has never been given the opportunity to develop a factual record on that claim, is entitled to an evidentiary hearing in federal court." *Karis*, 283 F.3d at 1127. This standard applies here because AEDPA did not change the standard for granting evidentiary hearings in Section 2255 proceedings. *Teti v. Bender*, 507 F.3d 50, 61 n.4 (1st Cir. 2007) (citing 2 Hertz & Liebman, *Federal Habeas Corpus Practice & Procedure* § 41.6d (5th ed. 2005)). In *Stanley*, this Court granted an evidentiary hearing on a "colorable" claim of ineffective assistance in a capital case, stating, "We simply cannot in good conscience continue to send men to their deaths without ensuring that their cases were not prejudiced by inadequate legal representation at any phase of the proceedings." 598 F.3d at 615. Likewise, Mitchell's convictions and death sentence should not be affirmed solely on the basis of counsel's depositions, which contradict each other and the record, as his ineffective-assistance claims are at least sufficiently colorable to warrant full factual development at a hearing.

### D. THE DISTRICT COURT ERRED BY NOT PERMITTING MITCHELL'S POST-CONVICTION COUNSEL TO INTERVIEW THE JURORS IN HIS CASE.

**Standard of Review**

This Court generally reviews the district court's application of a local rule for abuse of discretion. *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009). However, to the extent the district court's decision implicated questions of statutory interpretation and constitutional law, this Court should review the denial of juror interviews de novo. *Cf. United States v. Ward*, 989 F.2d 1015, 1016 (9th Cir. 1992); *United States v. Kohl*, 972 F.2d 294, 297 (9th Cir. 1992).

## Discussion

### 1. *Mitchell's Request for Leave to Interview the Trial Jurors*

Prior to filing Mitchell's Section 2255 motion, post-conviction counsel sought leave to interview the jurors in his case. (CR 1.) Leave of court was required by a District of Arizona rule that prohibits attorneys from contacting jurors after trial unless they submit written interrogatories to the district court "within the time granted for a motion for a new trial"[13] and show "good cause" for the interview. D. Ariz. Loc. Civ. R. 39.2(b); D. Ariz. Loc. Crim. R. 24.2.

The district court denied the request for juror interviews because Mitchell had not submitted proposed interrogatories and a supporting affidavit, or filed within the time granted for a motion for a new trial, as required by the local rule. (ER 2.) Alternatively, the district court concluded that Mitchell had not shown "good cause" for contacting the jurors. (ER 2-3.)

### 2. *Mitchell Has Shown Good Cause for Interviewing the Jurors.*

Several occurrences during Mitchell's trial constituted "good cause" for interviewing the jurors to ensure that they were not exposed to prejudicial extraneous information or outside influence. First, the jury indicated an inclination toward independent research when they sent the district court a note asking, "Are we allowed to consult detailed maps of this location to familiarize oursel[ves] with the aspects of this case?" (ER 741.) Although the district court later admonished the jury not to conduct any independent research, it did not make a record as to whether any juror had already done so. (ER 776.) The next day, a

---

[13] At the time of Mitchell's trial, a motion for a new trial had to be filed within seven days after the verdict, or three years if "grounded on newly discovered evidence." Fed. R. Crim. P. 33(b) (2002). The jury delivered its penalty-phase verdict on May 20, 2003, so the latest possible date for filing a new-trial motion was May 20, 2006.

juror asked the bailiff whether the jury could ask questions of the witnesses, another indication of the jury's desire to go beyond the evidence presented at trial. (ER 780.) The following week, defense counsel noted that a juror was looking into the courtroom while preliminary matters were being discussed, but no record was made as to what he or she might have heard. (ER 885.) These events justified post-conviction interviews to ascertain whether any juror had seen or heard any extrinsic or inadmissible information.

Second, alternate juror L.M. reported that he heard three men discussing Mitchell's case in the courthouse. (ER 776, 946.) L.M. was not wearing his juror badge because he was on his way to the juror room. (ER 776.) Although L.M. told the district court he only heard the name of the case (ER 776), Mitchell was entitled to question not only L.M., but the other jurors, regarding possible extraneous information or outside influence they encountered while walking without their juror badges in the courthouse. In *United States v. Jackson*, 209 F.3d 1103 (9th Cir. 2000), this Court ordered a Section 2255 hearing on a jury tampering claim arising from a statement given by a juror to a defense investigator three years after trial. *Id.* at 1108. In *Jackson*, the district court had questioned the juror about a threatening phone call during trial, and the juror said he thought the call was unrelated to the trial. *Id.* at 1107-08. But the juror later stated that he believed there was a "'fifty-fifty' chance that the threat came from a defendant." *Id.* at 1109. Because of the discrepancy between the juror's voir dire testimony and his subsequent statement to the defense investigator, this Court ordered a hearing to determine whether "the juror (or other jurors)" believed that the call was designed to hang the jury. *Id.* at 1110. *Jackson* demonstrates why the district court's voir dire of L.M. does not obviate the need for juror interviews. Rather, the L.M. incident constitutes "good cause" for post-conviction investigation.

Finally, members of the victims' family wore commemorative buttons during trial. (ER 904.) In *Norris v. Risley*, 878 F.2d 1178 (9th Cir. 1989), this Court ordered an evidentiary hearing at which jurors were called to testify as to whether they saw buttons worn by spectators or passed through the spectators "as they entered and exited the courtroom." *Id.* at 1183. If a hearing was warranted in *Norris*, Mitchell has shown good cause for the less burdensome and intrusive procedure of voluntary juror interviews.

**3. *Even if Mitchell Has Not Shown Good Cause, The District Court Erred by Rigidly Enforcing a Local Rule in Violation of the Section 2255 Rules and the Fifth, Sixth, and Eighth Amendments.***

The Rules Governing Section 2255 Proceedings for the United States District Courts provide that "[t]he Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure, to the extent that they are not inconsistent with any statutory provision or these rules, may be applied to a proceeding under these rules." Rule 12, Section 2255 Rules. The commentary refers to the analogous discussion in the commentary to Rule 12 of the Section 2254 rules, which explains that the rule

> permits the court considering the petition to use any of the rules of civil procedure (unless inconsistent with these rules of habeas corpus) when in its discretion the court decides they are appropriate under the circumstances of the particular case. The court does not have to rigidly apply rules which would be inconsistent or inequitable in the overall framework of habeas corpus.

Advisory Committee's Note to § 2254 Rule 12. Here, the district court erred by rigidly applying a local rule, not even a full-fledged federal rule, to deny post-conviction counsel the opportunity to interview the jurors in Mitchell's case.

Local Rule 39.2(b)'s time limit -- fourteen days in the usual case, three years in the case of newly discovered evidence -- is practically impossible for a capital Section 2225 movant to meet. Mitchell's direct appeal was not decided until September 5, 2007, 502 F.3d at 931, more than four years after the verdict, and his petition for certiorari was not denied until June 9, 2008 (ER 1105-1106), more than five years after the verdict. Counsel on direct appeal has no incentive to request juror interviews because this Court "generally will not consider facts outside the record developed before the district court." *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007) (internal quotation marks and citation omitted). Just as Section 2255 proceedings, and not direct appeal, are the preferred forum for developing the extra-record facts necessary to support most ineffective- assistance claims, *Massaro*, 538 U.S. at 504-06, claims of extraneous prejudicial information or outside influence require factual development and are therefore more efficiently litigated in collateral proceedings. And because any Section 2255 motion raising ineffective assistance of trial counsel is necessarily raised by successor counsel, it is unreasonable to expect the Section 2255 investigation to begin years before the case is final on direct review and before successor counsel has even been appointed. Application of the local rule is thus "inconsistent or inequitable" in the Section 2255 context.

Application of the local rule, with its "good cause" standard, is particularly inequitable in the Section 2255 context because Arizona's rule is an outlier, both in this circuit and in the nation at large. Of the 31 districts where there is currently a federal death sentence in place, at most six require a showing of good cause before counsel can contact jurors after trial; seventeen others require leave of

court; and eight do not require leave of court for post-trial juror contact.[14] None of the 30 other jurisdictions with a federal death sentence imposes any sort of time limit on juror interviews. Of the fifteen district courts in the Ninth Circuit, only two -- the District of Arizona and the District of Montana -- require a "good cause" showing. D. Ariz. Loc.. Civ. R. 39.2(b); D. Ariz. Loc. Crim. R. 24.2; D. Mont. Loc. Civ. R. 48.1(b); D. Mont. Loc. Crim. R. 24.2(b). Five other district courts require leave of court without a "good cause" showing. D. Alaska Loc. Civ. R. 83.1(h); D. Or. Loc. R. 48-2; E.D. Wash. Loc. R. 47.1(d); W.D. Wash. Loc. R. 47(d). Eight district courts in the Ninth Circuit impose no post-trial restrictions on juror contacts whatsoever. And had the crimes occurred just over the state line, on the Navajo Reservation in New Mexico, Mitchell would not need to seek leave of court or show good cause before conducting juror interviews. Section 2255 and its accompanying rules do not contemplate this sort of inconsistent and inequitable treatment of similarly situated federal prisoners, in violation of the Fifth Amendment's due process and equal protection guarantees.

Application of the local rule also conflicts with the duty of post-conviction counsel in a capital case to conduct "an aggressive investigation of all aspects of the case." ABA 2003 Death Penalty Guidelines 10.15.1(E)(4). The commentary to the ABA Death Penalty Guidelines explains that post-conviction counsel must conduct a "thorough, independent investigation" of, *inter alia*, juror misconduct, because "the trial record is unlikely to provide either a complete or accurate picture of the facts and issues in the case." 31 Hofstra L. Rev. 913, 1085-86 (2003). Therefore, it is not surprising that interviewing the jurors and alternates is a routine part of a thorough habeas investigation in a capital case. (ER 3467.)

---

[14] In the interest of brevity, the citation and text for each of these local rules can be found at pages 3-26 of the separately bound Statutory Addendum.

Although the constitutional right to effective assistance of counsel in post-conviction proceedings is an open question, *see Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012), Mitchell submits that he has a Sixth Amendment right to effective assistance in these Section 2255 proceedings, especially for claims that could not have previously been raised on direct review. Indeed, because this Court has relied in part on a juror declaration to evaluate whether a petitioner was prejudiced by ineffective assistance at the penalty phase, *see Silva*, 279 F.3d at 850, competent post-conviction counsel would seek to obtain declarations from the seated jurors and alternates.

Even if Sixth Amendment concerns do not trump the local rule, the Eighth Amendment's requirements do. The Supreme Court's capital punishment jurisprudence has proceeded on "the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long," and that there is "a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *see also Mills v. Maryland*, 486 U.S. 367, 376 (1988) ("In reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds."). This Court has granted habeas relief in a capital case where post-conviction interview of jurors uncovered a meritorious claim of extraneous information that affected the fundamental fairness of the trial. *See Jeffries v. Blodgett*, 5 F.3d 1180, 1189-90 (9th Cir. 1993); *Jeffries v. Wood*, 114 F.3d 1484, 1490-91 (9th Cir. 1997) (en banc). Thus, the local rule's idiosyncratic requirements must give way to the need for accurate fact-finding in Section 2255 proceedings, and the constitutional concerns relating to effective assistance of counsel and the reliability of death sentences.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

UNITED STATES OF AMERICA, )
)
)
Plaintiff, )
)
vs. ) NO. CR 01-1062 PCT-MHM
)
LEZMOND MITCHELL, ) Phoenix, Arizona
) April 30, 2003
) 9:34 a.m.
Defendant. )
)

REPORTER'S REDACTED TRANSCRIPT OF PROCEEDINGS

(Jury Trial - Day 15)

BEFORE THE HONORABLE MARY H. MURGUIA

Court Reporter: Merilyn A. Sanchez, CRR
Sandra Day O'Connor U.S. Courthouse
401 W. Washington Street SPC-37
Phoenix, Arizona 85003-2118
(602) 322-7250

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

Case: 18-17031, 09/27/2019, ID: 11447210, DktEntry: 22, Page 13 of 125

# A P P E A R A N C E S

For the Plaintiff:
Vincent Q. Kirby, Esq.
Kurt M. Altman, Esq.
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408

For the Defendant Mitchell:
John M. Sears, Esq.
107 N. Cortez, Suite 104
Prescott, Arizona 86301
Jeffrey A. Williams, Esq.
Gregory A. Bartolomei, Esq.
Assistant Federal Public Defenders
320 N. Central Avenue, Suite 200
Phoenix, Arizona 85004

INDEX


| Witness: | Direct | Cross | Redirect | Recross | VD |
|---|---|---|---|---|---|
| WALLACE BILLIE | | | | | |
| By Mr. Kirby | 2698 | | | | |
| By Mr. Sears | | 2702 | | | |
| By Mr. Kirby | | | 2707 | | |
| DARRELL BOYE | | | | | |
| By Mr. Kirby | 2709 | | | | |
| By Mr. Williams | | 2716 | | | |
| TRACE L. KIRK | | | | | |
| By Mr. Kirby | 2721 | | | | |
| By Mr. Sears | | 2730 | | | |
| JASON KINLICHEENIE | | | | | |
| By Mr. Kirby | 2775 | | | | |
| By Mr. Williams | | | | | 2813 |
| By Mr. Kirby | 2814 | | | | |
| By Mr. Williams | | 2827 | | | |
| By Mr. Kirby | | | 2860 | | |
| RAUSHANDAL COMBS | | | | | |
| By Mr. Kirby | 2864 | | | | |
| By Mr. Sears | | 2870 | | | |
| By Mr. Kirby | | | 2879 | | |
| By Mr. Sears | | | | 2882 | |
| RANDALL COMBS | | | | | |
| By Mr. Kirby | 2883 | | | | |
| McDONALD ROMINGER | | | | | |
| By Mr. Kirby | 2888 | | | | |


Case: 18-17031, 09/27/2019, ID: 11447210, DktEntry: 22, Page 15 of 125

## E X H I B I T S

| No. | Description | Identified | Admitted |
|---|---|---|---|
| 4 | Map | 2713 | 2713 |
| 24 | Photograph | 2784 | 2784 |
| 25 | Photograph | 2780 | 2781 |
| 29 | Diagram | 2700 | 2700 |
| 56 | .22 caliber weapon | 2794 | 2795 |
| 57 | 410 gauge rifle | 2794 | 2795 |
| 59 | 12 gauge rifle | 2794 | 2796 |
| 61 | Shovel | 2809 | |
| 62 | Shovel | 2809 | 2811 |
| 63 | | 2809 | |
| 64 | | 2809 | |
| 65 | | 2812 | |
| 82 | Photograph | 2891 | 2892 |
| 83 | Photograph | 2894 | 2894 |
| 84 | Photograph | 2896 | 2897 |
| 86 | Photograph | 2898 | 2898 |
| 89 | Photograph | 2899 | 2900 |
| 90 | Photograph | 2900 | 2901 |
| 91 | Photograph | 2902 | 2902 |
| 92 | Photograph | 2903 | 2904 |
| 93 | Old man mask | 2792 | 2792 |
| 94 | Photograph | 2904 | 2904 |
| 95 | Vampire mask | 2791 | 2792 |
| 97 | Werewolf mask | 2791 | 2792 |
| 98 | Photograph | 2905 | 2906 |
| 100 | Gloves | 2801 | 2801 |
| 241 | Photograph | 2868 | 2870 |

## M I S C E L L A N E O U S

| | |
|---|---|
| Motion for Mistrial by Mr. Sears | 2736 |
| Motion for Mistrial by Mr. Sears | 2745 |
| Motion for Mistrial by Mr. Williams | 2822 |

Q. But what happened on this particular day is that you ATION BY MR. WILLIAMS took Mr. Mitchell to the location and then someone else took Mr. Orsinger to that same location eventually?

A. Yes. Mr. Orsinger was there already when we got to this location.

MR. WILLIAMS: Thank you.

THE COURT: Any redirect?

MR. KIRBY: No, Your Honor.

THE COURT: All right. Thank you. You may step down.

Before you step down, let me just instruct you not to discuss the case or your testimony with anyone else until the trial is over. Okay?

THE WITNESS: Okay.

THE COURT: You may call your next witness.

MR. KIRBY: The government would call Trace Kirk.

THE COURT: Please come forward and be sworn.

THE CLERK: Please state your name, sir.

THE WITNESS: Trace L. Kirk.

(The witness, Trace L. Kirk, was duly sworn.)

THE COURT: Thank you. You may proceed.

MR. KIRBY: Thank you.

TRACE L. KIRK,. KIRK - DIRECT EXAMINATION BY MR. KIRBY

called as a witness herein, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. KIRBY:

Q. Could we have your name, please.

A. Trace L. Kirk.

Q. Mr. Kirk, who are you employed by?

A. The Federal Bureau of Investigation.

Q. And what office are you currently assigned to?

A. Phoenix.

Q. And how long have you been with the bureau?

A. Approximately 21 years.

Q. And are you part of the group that investigates violent crimes?

A. Yes.

Q. Did you become involved in the robbery of a trading post and a missing persons case around November 4th of 2001?

A. Yes.

Q. Did you travel to Chinle, Arizona, for the purposes of assisting in the investigation?

A. Yes.

Q. And when you were at Chinle, did you meet with Agent Duncan?

A. Yes.
Q. And did he kind of fill you in on the investigation up to that point?
A. Yes.
Q. Did you then meet with Lezmond Mitchell?
A. Yes.
Q. Was Mr. Mitchell a suspect at that time?
A. Yes.
Q. And where did you meet with him?
A. In the conference room of the Navajo Criminal Investigator's office in Chinle.
Q. And was he in custody at that time?
A. Yes.
Q. And did you discuss his Miranda warnings with him?
A. Yes.
Q. And did he agree to talk with you?
A. Yes, he did.
Q. And did you discuss various aspects of this case --
A. Yes.
Q. -- with him?
Did he ever admit to being present during the murders of the elderly lady and the young girl?
A. Yes.
Q. Did you ever discuss with him any participation in the robbery of the trading post?

A. Yes.
Q. Did he admit his involvement in the robbery of the trading post?
A. Yes, he did.
Q. Did he advise you whether he used a mask or not?
A. He said he had used a mask.
Q. Do you recall what kind?
A. He wasn't sure. I believe he thought it was a vampire mask.
Q. Did he admit to whether he used a gun?
A. Yes, he said he used a 12-gauge shotgun.
Q. Was he alone or with others?
A. He was with others.
Q. Were they wearing masks as well?
A. He said they were.
Q. Did he make -- did he admit taking money from the safe?
A. Yes.
Q. And did he also admit whether or not he had tied any of the store clerks up?
A. He said he had tied at least one of the store clerks up.
Q. At the conclusion of your meetings with him, your interview with him, did he agree to show you to the bodies?
A. Yes, he said he would try to assist us in finding the bodies.
Q. And during this interview with him, was it just you and

he?

A. Yes.

Q. Now, on the morning of November 5th of 2001, did you interview Johnny Orsinger?

A. Yes.

Q. Did Mr. Orsinger agree to show you where the bodies were?

A. Yes.

Q. And did you travel with Mr. Orsinger in an attempt to find that location?

A. Yes.

Q. Did you go to the correct location right away?

A. No.

Q. What happened?

A. Mr. Orsinger took us to a location that turned out not to be the correct location initially.

Q. Do you know -- do you know yourself whether any attempts were made to get Mr. Mitchell to assist at that point?

A. I don't recall specifically at that point Mr. Mitchell being contacted.

Q. And did Mr. Orsinger eventually get you to the correct location?

A. He did.

Q. And were the bodies of Ms. Slim and [redacted] found at that location?

A. Yes.
Q. Did Mr. Mitchell arrive at that location?
A. He did.
Q. Do you have an idea about how long you might have been there before he arrived?
A. It would be a guess. Approximately an hour.
Q. Did you meet with Mr. Mitchell out at -- out at the site?
A. Yes.
Q. And where did you meet him?
A. He was seated in the second seat of an SUV.
Q. Do you remember whose SUV it was?
A. I don't.
Q. Did you advise him, remind him of his rights again?
A. Yes, I did.
Q. Was there anyone present with you for that?
A. Special Agent Ray Duncan was present.
Q. And did you then proceed to interview Mr. Mitchell some more?
A. Yes.
Q. Was Agent Duncan present for that?
A. Yes, at least initially.
Q. Did at some point he leave?
A. Yes.
Q. Was there a lot of activity going on at that location --

A. There was.
Q. -- where you found the bodies?
A. Would you please repeat the question?
Q. You had found the two bodies at the location?
A. Yes, we had.
Q. Were you able to find the heads and the hands?
A. No, we had not been able to locate the heads nor the hands.
Q. Did anyone provide you with information that eventually led you to that location?
A. Yes.
Q. And who was that?
A. Mr. Mitchell.
Q. Did you advise Mr. Mitchell that you had conducted additional investigation?
A. Yes.
Q. Did you advise him that you had spoken with Johnny Orsinger?
A. I did.
Q. Did you ask him any questions about his involvement with Ms. Slim and [redacted]?
A. Yes.
Q. Did he -- what did he say to you about Ms. Slim?
A. The older woman?
Q. The older woman, I'm sorry.

A. He advised that he had participated in stabbing the MINATION BY MR. KIRBY
older woman in the pickup truck.
Q. Did you ask him about the young girl?
A. Yes.
Q. And what did he say?
A. He indicated to me that the evidence would probably show or the witnesses would say that he had cut the throat of the young girl twice.
Q. Did you ask him whether he had made any directions to the girl after that?
A. Could you rephrase the question?
Q. Did you ask him whether he made -- whether he had told the girl to do anything after that?
A. He, after he slashed the young girl's throat, he told her, in essence, to lay down on the ground and die.
Q. Did she lay down?
A. She did.
Q. And what did he say happened next? What did he say he did next?
A. He said that both he and Mr. Orsinger went and gathered large rocks, and with Mr. Orsinger leading the way, they took turns dropping the rocks on the girl's head.
Q. After that, what did he say they did?
A. After that, he said they removed the older woman's body, pulled it from the pickup truck, and pulled it away from the

truck out into the woods. He then said that Mr. Orsinger NATION BY MR. KIRBY went somewhere and obtained a shovel and an axe. And with the shovel, Mr. Mitchell said he started to dig a hole.

Q. What did he say Orsinger did?

A. He said Orsinger used the axe to sever the heads and hands from the victims.

Q. After that, what did Mitchell say he did?

A. He said that both he and Mr. Orsinger then gathered up the severed hands and heads of the victims and dropped them in the hole that he had dug.

Q. Did he give you an estimate of how deep the hole was?

A. He said it was about a foot deep. And he told me that we would find the heads and hands piled on top of each other in the hole he had dug.

Q. Did he advise whether or not he removed any of their clothing?

A. He indicated that Orsinger had removed the clothing and identifiable items such as jewelry and glasses and had placed these items in the back of the pickup truck.

Q. Did he say what they did with those items?

A. After they covered up the heads and hands and drug the torsos out into the woods, they then drove a hundred yards or so from this area and burned those items.

Q. Did you find a burn site at that approximate location?

A. Yes, we did.

Q. And did the defendant -- by the way, is he in the XAMINATION BY MR. KIRBY
courtroom here today?
A. Yes, he is.
Q. And did he tell you what he then did with the knives and -- afterward?
A. Yes, he did. He said that a short distance from where they had burned the items I just referred to was a stream. And he said that he and Mr. Orsinger went down to the stream, washed the instruments they had used along with their hands and faces in the stream to remove the blood.
Q. Did he tell you whether he did anything with the knives on the next day?
A. He said that the next day he washed both his and Mr. Orsinger's knife with alcohol to remove any blood from those instruments.
Q. About how long was this conversation?
A. The conversation at the SUV?
Q. Yes.
A. About 30 minutes.
Q. And it was primarily just you and Mr. Mitchell?
A. Yes.
Q. Was the interview tape recorded?
A. It was not.
Q. Any particular reason why it was not?
A. It's FBI policy, generally, not to tape record these

types of conversations.



Q. Is that a policy that you always agree with?
A. It's a policy I generally don't agree with.
Q. But nonetheless, you prepared a report of the statements that the defendant made to you?
A. Yes, I did.
Q. You mentioned that he -- early in the conversation, he had admitted to stabbing the older lady?
A. Yes.
Q. Did he provide what type of -- what type of knife he might have used?
A. He said it was a butterfly knife. And he referred to a knife that had been taken from him previously by investigators. He said that was the knife he utilized to stab the elderly woman.
MR. KIRBY: All right, Your Honor, nothing further. Thank you.
THE COURT: Mr. Sears?
MR. SEARS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SEARS:
Q. Good morning, Agent Kirk.
A. Good morning, Mr. Sears.
Q. Let's talk, if we could, for a minute about general FBI

THE COURT: Sir, I'm going to ask you to please XAMINATION BY MR. KIRBY
speak into the microphone when you speak, okay?

THE WITNESS: Yes, ma'am.

THE COURT: You may proceed.

MR. KIRBY: Thank you.

JASON KINLICHEENIE,

called as a witness herein, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. KIRBY:

Q. Please give us your name.
A. Jason Kinlicheenie.
Q. Mr. Kinlicheenie, where do you currently reside?
A. I didn't understand.
Q. Where are you living right now?
A. CCA.
Q. What's that?
A. Central detention center.
Q. Are you in jail?
A. Yes, sir.
Q. And before that, where does your family live?
A. Round Rock, Arizona.
Q. Is that on the Navajo Reservation?

A. Before Halloween.
Q. Okay. Was it talked about?
A. Yeah.
Q. By whom?
A. Gregory, Lezmond, Jakegory.
Q. Tell us what the plan was.
A. I didn't know exactly what was the plan, but they informed me about it.
Q. Who informed you of --
A. Jakegory, Gregory, and Lezmond.
Q. And did anyone do anything to help the plan along?
MR. WILLIAMS: Objection as to who is.
THE COURT: I'll allow this question. Go ahead and respond if you know.
THE WITNESS: Say -- repeat again.
BY MR. KIRBY:
Q. Did anyone do anything to help this plan along?
A. Yeah. Gregory, Lezmond and Jake I said.
Q. What did Lezmond do?
A. He planned, too.
Q. Did he do anything after the planning? Did he go somewhere?
A. Yeah.
Q. Where?
A. To get a truck.

Q. Why did you need a truck? JASON KINLICHEENIE - DIRECT EXAMINATION BY MR. KIRBY

A. Because that's what they needed.

Q. Where did he go?

A. Gallup, New Mexico.

Q. Did he go alone?

A. Went along with Johnny Orsinger.

Q. Were they gone for a period of time?

A. Two days.

Q. Did you see them when they got back?

A. Yeah.

Q. Where did you see them?

A. Gregory Nakai's house.

MR. KIRBY: Your Honor, may I show the witness Exhibit 25?

THE COURT: You may.

BY MR. KIRBY:

Q. Mr. Kinlicheenie, do you see Plaintiff's Exhibit 25 on that screen in front of you?

A. Yes, sir.

Q. Do you recognize what that shows?

A. That's where I live.

Q. Who else lives in that area?

A. Shirley Combs, Lilly, Keith, my Aunt Ida, Robert Claussen.

Q. Does Gregory Nakai live there?

A. Yes, sir.

MR. KIRBY: Your Honor, I would move the admission of Exhibit 25.

MR. WILLIAMS: No objection.

THE COURT: Number 25 is admitted.

BY MR. KIRBY:

Q. Mr. Kinlicheenie, can you see your -- let me say first, do you see Gregory Nakai's residence?

A. Yes, sir.

Q. And where is it in the picture?

A. The bottom screen.

Q. Approximately where I'm pointing to?

A. Yes, sir.

Q. Where would your house be?

A. A little bit top.

THE COURT: Did you want this published?

MR. KIRBY: Pardon?

THE COURT: Did you want this published?

MR. KIRBY: I'm sorry, yes, Your Honor, please.

THE COURT: It may be published.

BY MR. KIRBY:

Q. All right. Let me -- this is your -- this is Gregory Nakai's residence?

A. Yes, sir.

Q. And where is yours?

A. On the red top, with the red tile. ICHEENIE - DIRECT EXAMINATION BY MR. KIRBY

Q. This one here?

A. Yes, sir.

Q. Did you see Lezmond two days later?

A. Yes, sir.

Q. Did he tell you anything about the truck?

MR. WILLIAMS: Objection, leading.

THE COURT: I'll allow that.

THE WITNESS: Not at that time.

BY MR. KIRBY:

Q. Did he tell you something about the truck at another time?

A. Yeah, after I went and got some sodas for them.

Q. After that?

A. Yeah, then he told me.

Q. What did he tell you?

A. He said he got a truck.

Q. Anything more than that?

A. Yeah. He parked it like in the mountains and stuff.

Q. Pardon?

A. At the mountains.

Q. The mounds?

A. The Chukai Mountains.

Q. Did he tell you how he got it?

A. That came later.

Q. When?

A. Hour, two hours.

Q. What did he say then?

A. That they had took out some people meaning they killed some people.

Q. Did he describe the people?

A. Yes, sir.

Q. How did he describe them?

A. He said one was small and one was an old lady.

Q. Are you familiar with a term "Lezmond's Canyon"?

A. What's that?

Q. Are you familiar with a term "Lezmond's Canyon"?

A. Yes, sir.

Q. What is that?

A. That's where he closely lives.

Q. Pardon me?

A. He lives closely to the canyon.

Q. Who does?

A. Lezmond Mitchell.

Q. Is that -- is that the same place as where you say the truck was?

MR. WILLIAMS: Objection.

THE COURT: Sustained.

THE WITNESS: That's where he parked it first before he parked it at Lukachukai Mountain.

C E R T I F I C A T E

I, MERILYN A. SANCHEZ, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 11th day of May, 2003.

____________________________

MERILYN A. SANCHEZ, CRR

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR 01-1062 PCT-MHM |
| | ) | |
| LEZMOND MITCHELL, | ) | Phoenix, Arizona |
| | ) | May 1, 2003 |
| | ) | 9:31 a.m. |
| Defendant. | ) | |
| | ) | |

# REPORTER'S TRANSCRIPT OF PROCEEDINGS

(Jury Trial - Day 16)

BEFORE THE HONORABLE MARY H. MURGUIA

Court Reporter: Merilyn A. Sanchez, CRR
Sandra Day O'Connor U.S. Courthouse
401 W. Washington Street SPC-37
Phoenix, Arizona 85003-2118
(602) 322-7250

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

Case: 18-17031, 09/27/2019, ID: 11447210, DktEntry: 22, Page 35 of 125

A P P E A R A N C E S

For the Plaintiff: Vincent Q. Kirby, Esq.
Kurt M. Altman, Esq.
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408

For the Defendant Mitchell: John M. Sears, Esq.
107 N. Cortez, Suite 104
Prescott, Arizona 86301
Jeffrey A. Williams, Esq.
Gregory A. Bartolomei, Esq.
Assistant Federal Public Defenders
320 N. Central Avenue, Suite 200
Phoenix, Arizona 85004

# I N D E X


| Witness: | Direct | Cross | Redirect | Recross | VD |
|---|---|---|---|---|---|
| McDONALD ROMINGER | | | | | |
| By Mr. Altman | 2925 | | | | |
| By Mr. Sears | | | | | 2932 |
| By Mr. Altman | 2935 | | | | |
| By Mr. Sears | | | | | 2940 |
| By Mr. Altman | 2941 | | | | |
| By Mr. Sears | | 2947 | | | |
| KENT R. HUSH | | | | | |
| By Mr. Altman | 2956 | | | | |
| By Mr. Sears | | | | | 2979 |
| By Mr. Altman | 2981 | | | | |
| By Mr. Sears | | 2991 | | | |
| By Mr. Altman | | | 2999 | | |
| LOUIS ST. GERMAINE | | | | | |
| By Mr. Altman | 3001 | | | | |
| By Mr. Sears | | 3017 | | | |
| RANDALL BLUEHOUSE | | | | | |
| By Mr. Altman | 3022 | | | | |
| By Mr. Sears | | | | | 3030 |
| By Mr. Altman | 3031 | | | | |
| By Mr. Sears | | 3041 | | | |
| BRADLEY J. PURSCELL | | | | | |
| By Mr. Altman | 3047 | | | | |
| By Mr. Sears | | 3073 | | | |
| DAN K. SMITH | | | | | |
| By Mr. Altman | 3085 | | | | |
| RAYMOND A. DUNCAN, JR. | | | | | |
| By Mr. Kirby | 3090 | | | | |

EXHIBITS

| No. | Description | Identified | Admitted |
|---|---|---|---|
| 3 | Map | 3096 | 3097 |
| 25 | Photograph | 2959 | 2959 |
| 27 | Photograph | 2961 | 2961 |
| 28 | Photograph | 2968 | 2969 |
| 32 | Photograph | 2963 | 2964 |
| 33 | Photograph | 2963 | 2964 |
| 34 | Chrome butterfly knife | 2967 | 2968 |
| 35 | Photograph | 2970 | 2971 |
| 37 | Photograph | 2971 | 2971 |
| 38 | Black butterfly knife | 2972 | 2972 |
| 39 | Newspaper article | 2973 | 2974 |
| 40 | Wallet | 2974 | 2978 |
| 42 | Police 10 code | 2976 | 2981 |
| 43 | Photograph | 2982 | 2983 |
| 44 | Money wrapper | 2983 | 2984 |
| 45 | Photograph | 2981 | 2982 |
| 46 | Photograph | 2981 | 2982 |
| 47 | Police scanner | 2984 | 2984 |
| 48 | Photograph | 2984 | 2986 |
| 52 | Silver cell phone | 2986 | 2987 |
| 54 | Cell phone records | 3099 | 3100 |
| 67 | Photograph | 3013 | 3014 |
| 68 | Photograph | 3010 | 3010 |
| 69 | Photograph | 3010 | 3010 |
| 70 | Photograph | 3007 | 3007 |
| 71 | Photograph | 3006 | 3007 |
| 72 | Photograph | 3014 | 3015 |
| 101 | Photograph | 2925 | 2926 |
| 102 | Photograph | 2926 | 2926 |
| 103 | Photograph | 2927 | 2928 |
| 104 | Photograph | 2929 | 2929 |
| 105 | Photograph | 2931 | 2931 |
| 106 | Photograph | 2932 | 2935 |
| 107 | Photograph | 2936 | 2936 |
| 109 | Photograph | 2938 | 2938 |
| 111 | Photograph | 2939 | 2939 |
| 112 | Photograph | 2940 | 2940 |
| 113 | Photograph | 2941 | 2941 |
| 114 | Bag containing a floor mat | 2942 | 2944 |
| 115 | Photograph | 2944 | 2945 |
| 116 | Photograph | 2945 | 2946 |
| 147 | Photograph | 3049 | 3050 |
| 148 | Photograph | 3049 | 3050 |
| 149 | Photograph | 3050 | 3052 |

## E X H I B I T S

| No. | Description | Identified | Admitted |
|---|---|---|---|
| 150 | Photograph | 3053 | 3053 |
| 152 | Diagram | 3024 | 3025 |
| 152-A | Photograph | 3055 | 3055 |
| 154 | Photograph | 3056 | 3057 |
| 155 | Photograph | 3059 | 3059 |
| 156 | Photograph | 3058 | 3059 |
| 157 | Photograph | 3060 | 3061 |
| 157-A | Photograph | 3061 | |
| 158 | Photograph | 3062 | 3062 |
| 159 | Photograph | 3063 | 3063 |
| 160 | Latex gloves | 3064 | 3067 |
| 161 | Rock | 3087 | 3088 |
| 162 | Rock | 3087 | 3089 |
| 163 | Photograph | 3040 | 3041 |
| 165 | Photograph | 3038 | 3038 |
| 166 | White T-shirt | 3039 | 3040 |
| 167 | Photograph | 3036 | 3036 |
| 169 | Photograph | 3026 | 3027 |
| 170 | Photograph | 3028 | 3029 |
| 171 | Photograph | 3031 | 3031 |
| 172 | Burned credit card | 3032 | 3033 |
| 173 | Photograph | 3033 | 3034 |
| 174 | Business card | 3035 | 3036 |
| 174-A | Photograph | 3034 | 3034 |
| 175 | Photograph | 3037 | 3037 |
| 228 | Navajo Nation Certificate of Indian Blood | 3106 | 3106 |
| 229 | Advice of rights form | 3102 | 3103 |
| 233 | Advice of rights form | 3116 | 3117 |
| 243 | Bank of America records | 3124 | 3125 |
| 244 | General Motors records | 3101 | 3101 |

## M I S C E L L A N E O U S

Motion for Mistrial by Mr. Sears 3066

You may step down. Thank you.

You may call your next witness.

THE WITNESS: Would you like me to give this exhibit back that I have back here?

THE COURT: Yes, if you could take it down and drop it off.

MR. ALTMAN: Thank you, Your Honor. The United States calls Agent Kent Hush.

THE COURT: Sir, please come forward and be sworn.

THE CLERK: Please state your name.

THE WITNESS: Kent R. Hush.

(The witness, Kent R. Hush, was duly sworn.)

THE COURT: Please just speak into the microphone.

You may proceed.

MR. ALTMAN: Thank you, Your Honor.

KENT R. HUSH,

called as a witness herein, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ALTMAN:

Q. Agent Hush, could you give the jury your full name,

please.

A. Kent R. Hush.

Q. And I called you Agent Hush. What do you do for a living?

A. I'm a Special Agent for the FBI.

Q. And where is your current assignment in the FBI?

A. My current assignment is Tucson, Arizona.

Q. And how long have you been in Tucson?

A. A couple of months.

Q. And where were you before that?

A. For the three years previous to that, I was in Gallup, New Mexico.

Q. And what was your primary -- what were your primary duties as an agent in Gallup, New Mexico?

A. My duties were to investigate Indian crimes on the Arizona side of the Navajo Indian Reservation.

Q. In that capacity, did you become involved in the investigation of the deaths of Alyce Slim and [redacted]?

A. Yes, I did.

Q. About when did you become involved in that investigation?

A. Within the first few days of November, I think, of 2001.

Q. And were there a number of other agents involved?

A. Yes, there were.

Q. Were they pri- -- or solely from the FBI?

Q. What did you do with those pants once you found them?
A. I picked the pants up. When I picked the pants up, a silver knife fell out either from a pocket or from just laying in the fabric there on the floor.

I continued to make sure there were no other items in the pockets of the pants. And I believe there was a wallet in one of the back pockets of the pants that I also took out. And when I was sure that there was nothing in the pants in any of the pockets, then I brought them out for him to put them on.

MR. SEARS: Your Honor, at this time may the witness be shown Exhibits 32 and 33. They have not been admitted.

THE COURT: You may.

BY MR. ALTMAN:
Q. Agent Hush, what I'm going to show you first is Exhibit 32. Do you recognize what that is?
A. Yes. That's the silver butterfly-type knife that fell out of the pants when I lifted them up off of the ground.
Q. And then Exhibit 33.
A. That's a close-up of the same knife where it came to rest after it fell.

MR. ALTMAN: Your Honor, at this time the government would offer 32 and 33.

MR. SEARS: No objection.

butterfly knife depicted in Exhibit 33, if you find something that you believe is of value, what's the process that you go through to collect that?

A. The evidence will be collected, essentially the person who will -- who is responsible for searching a particular room, or it could be persons, if they find something they believe may be pertinent to the investigation, the item will be collected, placed in a bag, and then sealed, marked on the bag what it was, where it was found, and initialed and dated. And then it will be logged into an evidence log, which is what the evidence technician was there doing.

Q. Do you photograph it as it's found before you collect it?

A. Yes.

MR. ALTMAN: Your Honor, at this time may the witness be shown Exhibit 34, please.

THE COURT: He may.

BY MR. ALTMAN:

Q. Agent Hush, what you have in your hand is Exhibit 34. Do you recognize from looking at the bag what this is?

A. Yes, this is identified as a chrome butterfly knife, 11 and a half inches in length with a blade of three and three-quarter inches found in the northwest bedroom.

Q. If you can, could you open that up and take a look and see if it's actually the chrome butterfly knife.

A. Yes. This is the same knife.

Q. And is it in the same or similar condition as it was when you found it on the floor on November 4th?

A. Yes, it appears to be.

MR. ALTMAN: Your Honor, at this time the government would offer Exhibit 34.

MR. SEARS: No objection.

THE COURT: 34 is admitted.

BY MR. KIRBY:

Q. Agent Hush, I'm not sure if there's gloves up there or not.

A. Yes.

Q. If you could just show that knife to the jury from where you are, please.

Thank you. You can place it back in the bag.

MR. ALTMAN: Your Honor, may the witness be shown what has not been admitted as government's Exhibit Number 28?

THE COURT: You may.

BY MR. ALTMAN:

Q. Agent Hush, do you recognize what this is a photograph of?

A. This is a photograph taken from the door of that northwest bedroom toward the opposite corner. It does not show the bunk bed area. It's taken -- that would be out of

MR. SEARS: Yes, Your Honor.

THE COURT: All right. You may call them in.

(The jury entered the courtroom.)

THE COURT: Thank you. You may be seated.

The record may reflect the presence of the defendant, counsel and the jury.

You may resume your direct examination of Agent Hush.

Sir, I just want to remind you that you are still under oath.

MR. ALTMAN: Thank you, Your Honor. May the witness be shown Exhibit Number 40.

THE COURT: He may.

THE WITNESS: It's here.

BY MR. ALTMAN:

Q. Agent, Hush, can you take a look at that and tell me if you recognize what's in Exhibit 40.

A. Yes. This is the wallet that came out of the pants that Mr. Mitchell told me to get for him.

Q. Was there any material -- is there any material in that wallet?

A. Yes. There are several business-type cards, social security card, a -- some items related to the Diamondbacks, various personal items.

Q. And is that wallet in the same or substantially similar

condition as it was on November 4th?
A. Yes, it is.
MR. ALTMAN: Your Honor, at this time government would offer Number 40.
MR. SEARS: No objection.
THE COURT: Number 40 is admitted.
BY MR. ALTMAN:
Q. Now, Agent Hush, you said there are several personal items and a social security card inside that wallet. Do they all relate to the defendant, Lezmond Mitchell?
A. Yes. As far as I can tell they all do.
Q. And if you could look at Exhibit 29 again, which is on the screen, and show the jury -- now it's on the screen -- and show the jury if you can what number corresponds with where you found that wallet?
A. Right from the area where I took the pants, in between the bunk bed and the door and in the northwest bedroom, number ten.
MR. ALTMAN: Now, Your Honor, may the witness be shown Exhibit 42.
THE COURT: He may.
BY MR. ALTMAN:
Q. Agent Hush, do you recognize Exhibit 42 after you take a look at it?
A. Yes. These were notes that were taken. They were

RAYMOND A. DUNCAN, JR.,

called as a witness herein, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. KIRBY:

Q. Please give us your name.
A. Raymond A. Duncan, Jr.
Q. Who do you work for?
A. The FBI.
Q. And where are you currently assigned?
A. Phoenix, Arizona.
Q. How long have you been in the Phoenix division? I'm sorry, a bad question.
How long have you been in the Phoenix office?
A. About three months.
Q. And prior to that assignment, where were you stationed?
A. Gallup, New Mexico, in the Phoenix division.
Q. And for how long were you in Gallup?
A. Approximately three years.
Q. And prior to Gallup?
A. San Francisco, California.
Q. Agent Duncan, did you become involved with a missing persons and/or trading post robbery late 2001?
A. Yes.

Q. Do you know what FD stands for?
A. I don't specifically. I believe it stands for federal document.
Q. And that is a document that was used that morning or that day?
A. Yes.
MR. KIRBY: Your Honor, I'll move the admission of Exhibit 229.
MR. SEARS: No objection.
THE COURT: 229 is admitted.
MR. KIRBY: Your Honor, may I publish that?
THE COURT: You may.
BY MR. KIRBY:
Q. Agent Duncan, I have Exhibit 229 on the screen. Did you go over this document with the defendant?
A. Yes.
Q. In English?
A. Yes.
Q. Did you read each word to him?
A. Yes.
Q. Did he follow along or --
A. I believe he did.
Q. And were you -- was anyone else in the room with you at that time?
A. Yes.

Q. And who was that?

A. Navajo Department of Criminal Investigations CI Darrell Boye.

Q. And if you would, would you read what that document says.

A. At the top it says, "Advice of rights. Place, date, time. Your rights. Before we ask you any questions, you must understand your rights."

"You have the right to remain silent.

"Anything you say can be used against you in court.

"You have the right to talk to a lawyer for advice before we ask you any questions.

"You have the right to have a lawyer with you during questioning.

"If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

"If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

"Waiver of rights."

Q. Let me just stop you right there. Before you get to the waiver, when you get to that section, do you say anything, or did you say anything in this case?

A. Yes.

Q. What did you say?
A. I explain that I'm going to read the waiver of rights at that time.
Q. If you would. If you would go ahead and read the waiver.
A. "I have read this statement of my rights and I understand what my rights are. At this time I am willing to answer questions without a lawyer present."
Q. In this case whose signature is there on the line signed?
A. Lezmond C. Mitchell.
Q. Did you watch him put his signature there?
A. Yes.
Q. Had he agreed to waive his rights and talk to you?
A. Yes.
Q. And is that your signature on the witness line?
A. Yes.
Q. And whose signature is that on the second witness line?
A. Darrell Boye.
Q. And the time is?
A. 2:00 p.m.
Q. Did you get some preliminary information from the defendant?
A. Yes.
Q. And did you -- at -- let me strike that.

Q. And did you discuss whether he was a member of the Navajo Tribe?
A. Yes.
Q. Did he admit that he was?
A. Yes.
Q. Let me ask you something, prior to -- or during the waiver of the rights process, when you asked -- did you ask him whether he was going to waive his rights?
A. Yes, I did.
Q. And do you recall what he did in response?
A. Yes.
Q. What did he do?
A. He asked for a coin.
Q. What kind of coin?
A. Change.
Q. Did you --
A. He was given a nickel.
Q. By who?
A. Darrell Boye.
Q. And did he do anything with the nickel?
A. Yes.
Q. What did he do?
A. He flipped it in the air and it fell on the floor.
Q. Did he say anything?
A. He said he guessed he would talk to us after it fell on

the floor. I asked him what that meant. He said, "I guess I'll talk to you."

MR. KIRBY: Your Honor, may I just have a moment?

BY MR. KIRBY:

Q. Okay. After that interview, trade -- Agent Kirk became involved in the interview process?

A. Yes.

Q. And later on you were present during a recorded statement of Mitchell's?

A. Yes.

Q. During that statement, did he acknowledge at that point that he was present when things happened to a grandmother and granddaughter?

A. Yes.

Q. Did he admit that he was involved with the trading post robbery?

A. Yes.

Q. At some point during that discussion he agreed to lead you to the bodies the next day?

A. Yes.

Q. Now, the next day, November -- yes, November 5th, 2001, Johnny Orsinger was arrested?

A. Yes, he was.

Q. And you and Agent Kirk interviewed him?

A. That's correct.

Q. And he agreed also to lead you to the bodies?
A. He did.
Q. Did you go with Orsinger in search of the bodies?
A. Yes, I did.
Q. And did he lead you directly to the scene?
A. Not directly.
Q. Did he make -- take you to another location?
A. Yes, he did.
Q. At that time did you do anything or make any phone calls to remedy the situation?
A. Yes, I did. I contacted the Chinle police dispatch and requested Lezmond Mitchell be brought out.
Q. And was Mr. Orsinger within earshot?
A. He was in my vehicle and he could hear the radio.
Q. And after you made that call, did you find the right location?
A. Yes, we did.
Q. And who took you there?
A. Johnny Orsinger.
Q. Now, once at the location, did you have overall responsibility for trying to coordinate the investigation of the scene?
A. Overall as the case agent, yes.
Q. You had any number of different agents, criminal investigators, crime scene folks coming?

A. Yes, they were arriving.
Q. Were you also on the telephone looking for some further assistance?
A. Yes. I had contacted my supervisor in Flagstaff and advised him that we had located the crime scene, and he asked me to dictate an e-mail, which I did, to kind of update him on the situation.
Q. And during this time were you attempting to coordinate how to begin the search follow-up and the search?
A. Yes. I had a discussion with my supervisor about resources needed. We had discussed possibly using the evidence response team from Phoenix. However, we had agreed that that would take possibly more than one day for them to arrive and we decided since there were more people arriving, that we could process the crime scene with the people that were arriving.
Q. And is that what you did?
A. Yes.
Q. Now, were you made aware or did you see when Lezmond Mitchell arrived at the site?
A. I saw him arrive.
Q. Do you have an idea of how long you might have been there prior to his arrival?
A. I think it's between 45 minutes and an hour.
Q. You were doing all sorts of things during this time?

A. Yes, I was.
Q. At some point were you present when Agent Kirk began an interview with Lezmond Mitchell?
A. Yes, I was.
Q. And how did that come about?
A. I was doing administrative things in terms of trying to figure out who's going to help me process the crime scene. And Agent Kirk asked me if I could witness an advice of rights for an interview that he was planning with Mr. Mitchell. And I agreed to do that.
Q. And did you do that?
A. Yes, I did.
Q. And were you present when Agent Kirk -- I guess was it a reminder?
A. Yes.
Q. And what was it a reminder of?
A. It was a reminder of his Miranda rights which were read to him the previous day.
Q. By you?
A. Yes. And Agent Kirk.
Q. In a subsequent interview?
A. Yes.
Q. And were you present when Mitchell gave his response?
A. Yes.
Q. And what did he say?

A. Words to the effect: I know what my rights are. Go ahead and ask your questions.
Q. And did Agent Kirk begin to question him at that point?
A. I don't know. I stepped away from the interview at that moment.
Q. And did you go somewhere else?
A. Yes, I did.
Q. Did you have some prearranged plan to step in, step out?
A. No, I didn't.
Q. A substantial amount of evidence was collected at the scene?
A. Yes.
Q. As the investigation continued even after that day, a various number of labs and medical examiners' offices were involved?
A. Yes.
Q. Fingerprint analysis?
A. Yes.
Q. At the time of this case -- this case, there also was another -- another case occupying a lot of time of other agents?
A. Yes, there was.
Q. So manpower was a little on the thin side?
A. Yes.
Q. Most of the matters that have been testified here today,

were you personally there?
A. Yes. Most of them.
Q. You saw the rocks introduced here a little earlier ago. In fact, you were the one helping to introduce them?
A. Yes, I did.
Q. At some time later, did you have an opportunity to weigh those rocks?
A. Yes.
Q. Where?
A. At the FBI office in Phoenix.
Q. And did you use a scale?
A. Yes.
Q. What's that scale normally used for?
A. Weighing drugs, I believe.
Q. And did you weigh each of those rocks?
A. Yes, I did.
Q. And what was the approximate weight of each rock?
A. 20 pounds.
Q. Was there a point in the interview process up to that point where Mitchell talked about watching videos?
A. When I interviewed him on the 29th, yes.
Q. After you left the scene, the defendant was sent back to the tribal jail?
A. Yes.
Q. The investigation continued?

A. Yes.
Q. Interviews were conducted?
A. Yes.
Q. Examinations were done?
A. Yes.
Q. And at some point were both Mitchell and Orsinger charged federally?
A. Yes.
Q. And in connection with those charges, was the defendant driven to Flagstaff?
A. Yes, he was.
Q. And who drove him to Flagstaff?
A. I did. And I was accompanied by Special Agent Doug Litner from the FBI Gallup division.
Q. And about how long a drive?
A. Two hours, 40 minutes.
Q. And during the drive was there any kind of general conversations?
A. Yes, there was.
Q. Did that involve the defendant?
A. Some of it.
Q. What particular points involved him?
A. I remember that we were talking about baseball and the World Series that had just ended. And we also had some brief discussions about the September 11th terrorist attacks

in New York and Washington, D.C.
Q. And was he -- was Mitchell made aware of why he was going to Flagstaff?
A. Yes. I told him when we picked him up that he was going to Federal Court to see a magistrate judge and he was going to be charged federally for murder and kidnapping at that point.
Q. Did he say anything in response to that?
A. I don't recall that he did.
Q. When you arrived in Flagstaff at some point, did you reinterview Mitchell?
A. Yes.
Q. And who was with you?
A. Special Agent Kent Hush from the FBI.
Q. And did you Mirandize him at that point?
A. Yes, I did.
MR. KIRBY: Your Honor, may the witness be shown Exhibit 233.
THE COURT: He may.
BY MR. KIRBY:
Q. Do you have 233 in front of you?
A. Yes, I do.
Q. What is that?
A. Original FD-395 used that day.
Q. Is that the printed material, is that identical to the

one you previously read into the record?

A. Yes.

Q. And did you use that on that day?

A. Yes, I did.

Q. Did you read it to the defendant?

A. Yes, I did.

Q. Did he agree to waive his rights?

A. Yes, he did.

Q. Were any threats on either occasion, any threats made against him?

A. No.

Q. Any force?

A. No.

Q. Any promises?

A. No.

Q. Was he presented with that form and did he sign it?

A. Yes, he did.

Q. Did he agree to talk to you?

A. He did.

MR. KIRBY: Your Honor, I would move the admission of Exhibit 233.

MR. SEARS: No objection.

THE COURT: 233 will be admitted.

BY MR. KIRBY:

Q. Now, during this conversation with the defendant, did he

explain his activity the prior weekend?

A. Yes, he did.

Q. And what did he -- what did he tell you?

A. He said that he and Johnny Orsinger had hitchhiked from Round Rock, Arizona, to Gallup, New Mexico, to buy some liquor.

Q. And which night did they leave?

A. Saturday night.

Q. Could it have been Friday night?

A. Possibly could have.

Q. They hitchhiked to Gallup?

A. Yes.

Q. Was there a discussion about knives?

A. Yes. Mr. Mitchell said that he and Orsinger had gone to the Gallup mall where they had bought one knife and he said Mr. Orsinger stole another knife that he described as a claw knife.

Q. And at some point did they decide to return back to Round Rock?

A. Yes.

Q. And did he describe getting a -- an early ride out of Gallup?

A. Yes, he described being picked up while hitchhiking by a trucker from either El Paso or Chowchilla, Mexico.

Q. And where -- what town, what location were they near

when they were picked up?
A. I believe they were north of Gallup, between Gallup and Ya Ta Hey, New Mexico.
Q. I'm going to show you what's previously been introduced as Number 3. Do you see it here -- do you see Ya Ta Hey on that map?
A. Yes, I do.
Q. Would you go ahead and circle it? Is it actually at an intersection of two major roads?
A. Yes.
Q. Do you recall what roads those are?
A. Yes.
Q. What are they?
A. I believe either New Mexico Route 666 and Arizona State Route 264.
Q. Which goes to Window Rock?
A. Yes, it does.
Q. And how far did they get with this trucker?
A. In the area of Ya Ta Hey at that intersection.
Q. What happened?
A. They were dropped off.
Q. And which direction did they then proceed?
A. Towards Window Rock.
Q. And did they get another ride?
A. Yes.

Q. And was the person who gave them this ride described to you by Mr. Mitchell?
A. Yes.
Q. And what was the description?
A. An older lady.
Q. And where was he picked up?
A. He was unclear but he gave in the vicinity of Window Rock, Tse Bonito or Fort Defiance.
Q. Are you looking on the screen at Number 3?
A. Yes, I am.
Q. Is Tse Bonito in New Mexico?
A. Yes, it is. It's right on the state line across from Window Rock.
Q. Okay. And then Window Rock, but he wasn't sure where he was picked up. Was there anyone else with this lady?
A. A young girl.
Q. And did they tell this lady where they needed to go?
A. Yes.
Q. And where did they tell them that they were going?
A. Towards Round Rock and they requested to be dropped off in the vicinity of Sawmill, Arizona.
Q. And is Sawmill on Exhibit Number 3?
A. Yes, it is.
Q. Can you put -- would you mark a circle around that.
Did he indicate at some point that the driver

stopped?
A. Yes.
Q. And why did she stop?
A. To let them out.
Q. By the way, did he mention something -- some descriptive -- some description of what road might have been involved?
A. Yes. He mentioned that he was in the vicinity of old something road. He didn't know what the something was.
Q. In that area of Sawmill, Fort Defiance, is there an old something road?
A. There's an Old Red Lake Road in that vicinity.
Q. In any event, the lady stopped the truck. What happened?
A. He said that Johnny Orsinger began attacking the driver, the older lady with a knife.
Q. And did the defendant indicate that he stabbed her as well?
A. He did.
Q. And did he indicate about how many times he thought he did?
A. Between four and five times.
Q. And did he say what he did with the lady afterward?
A. Yes.
Q. What did they do?

A. He said that Johnny drug her over the seat and put her in the back quad cab seat, the rear seat.

Q. Did anybody do anything with the little girl?

A. Yes.

Q. Did anybody put her in the back seat?

A. Yes.

Q. And who drove off with the truck?

A. Initially Johnny Orsinger and later Lezmond Mitchell.

Q. And did they drive up into the mountains?

A. Yes.

Q. Did he admit whether they had dragged the bodies out of the car?

A. Yes.

Q. And did he admit that he threw rocks on the young girl's head?

A. He did.

Q. About how many times?

A. I believe a couple or two.

Q. And to the best of his knowledge, was she alive at this time?

A. Yes.

Q. Did he confirm that they had engaged in severing the head and the hands?

A. He did.

Q. Did he recall when that took place in connection with

this activity?
A. He told me that day that it was that night.
Q. Did you ask him if that -- whether that was -- whether the severing was his idea?
A. Yes, I did.
Q. And did he give you a response?
A. Yes.
Q. And what was it?
A. He said it was not his idea, it was Johnny Orsinger's idea because if it was his idea, he would also have severed the feet.
Q. Did he confirm that -- whether he had dug the hole?
A. Yes.
Q. Did he confirm whether he helped put the heads and the hands into the hole?
A. He said that he and Johnny did that, I believe.
Q. Do you have an idea from the Sawmill area up to where you recovered the bodies about how far that is mileagewise?
A. I'm estimating, but I would say it's approximately 30 plus miles.
Q. And are both of these areas, the Sawmill area and where the bodies are recovered, are on the Navajo Indian Reservation in Arizona?
A. Yes.
Q. Did you have a short discussion with the defendant at

C E R T I F I C A T E

I, MERILYN A. SANCHEZ, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 10th day of August, 2003.

_________________________

MERILYN A. SANCHEZ, CRR

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

UNITED STATES OF AMERICA, )
)
)
Plaintiff, )
)
vs. ) NO. CR 01-1062 PCT-MHM
)
LEZMOND MITCHELL, ) Phoenix, Arizona
) May 2, 2003
) 9:22 a.m.
Defendant. )
)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(Jury Trial - Day 17)

BEFORE THE HONORABLE MARY H. MURGUIA

Court Reporter: Merilyn A. Sanchez, CRR
Sandra Day O'Connor U.S. Courthouse
401 W. Washington Street SPC-37
Phoenix, Arizona 85003-2118
(602) 322-7250

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

A P P E A R A N C E S

| | |
|---|---|
| For the Plaintiff: | Vincent Q. Kirby, Esq.<br>Kurt M. Altman, Esq.<br>Assistant U.S. Attorneys<br>Two Renaissance Square<br>40 N. Central Avenue, Suite 1200<br>Phoenix, Arizona 85004-4408 |
| For the Defendant Mitchell: | John M. Sears, Esq.<br>107 N. Cortez, Suite 104<br>Prescott, Arizona 86301<br>Jeffrey A. Williams, Esq.<br>Gregory A. Bartolomei, Esq.<br>Assistant Federal Public Defenders<br>320 N. Central Avenue, Suite 200<br>Phoenix, Arizona 85004 |

# I N D E X


| Witness: | Direct | Cross | Redirect | Recross | VD |
|---|---|---|---|---|---|
| RAYMOND A. DUNCAN, JR. | | | | | |
| By Mr. Kirby | 3139 | | | | |
| By Mr. Sears | | 3140 | | | |
| By Mr. Kirby | | | 3166 | | |
| RICHARD A. ERFERT | | | | | |
| By Mr. Altman | 3170 | | | | |
| By Mr. Williams | | 3191 | | | |
| By Mr. Altman | | | 3193 | | |
| BENITA E. BOCK | | | | | |
| By Mr. Altman | 3198 | | | | |
| By Mr. Sears | | 3222 | | | |


# E X H I B I T S


| No. | Description | Identified | Admitted |
|---|---|---|---|
| 117 | Photograph | 3204 | 3205 |
| 118 | Photograph | 3204 | 3205 |
| 120 | Photograph | 3204 | 3205 |
| 121 | Photograph | 3204 | 3205 |
| 139-A | Drawing | 3184 | 3184 |
| 140 | Latent fingerprint card | 3185 | 3186 |
| 141 | Enlarged copy of Exhibit 140 | 3187 | 3187 |
| 142 | Latent fingerprint card | 3185 | 3186 |
| 143 | Enlarged copy of Exhibit 142 | 3187 | 3187 |
| 144 | Fingerprints of Lezmond Mitchell | 3189 | 3189 |

(The witness, Benita Ellen Bock, was duly sworn.)

THE COURT: Please just speak into the microphone.

You may proceed.

MR. ALTMAN: Thank you, Your Honor.

BENITA ELLEN BOCK,

called as a witness herein, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ALTMAN:

Q. Good morning. Could you tell the jury your full name, please.

A. My name is Benita Ellen Bock.

Q. And, Ms. Bock, where do you work?

A. I work for the Arizona Department of Public Safety, Northern Regional Crime Lab in Flagstaff.

Q. What do you do for the Northern Regional Crime Lab?

A. I am a forensic biologist. I analyze blood and body fluid stains.

Q. How long have you done that?

A. I've worked in the field of forensics for 25 years now.

Q. What type of education or experience do you need to work with the materials that you just indicated?

A. Yes, I did.
Q. And could you tell the jury where you went to do that?
A. I analyzed -- I examined a vehicle at the FBI office in Flagstaff.
Q. And when you examined the vehicle, were you able to retrieve some samples of tissue or blood that was later analyzed?
A. Yes, I collected a number of blood and other samples.
Q. And the things that you collected and analyzed in this case, who -- did you have known samples to which you compared your forensic samples?
A. Knowns were submitted to the laboratory at a later date, yes.
Q. For comparison?
A. Yes, for comparison to these samples.
Q. And specifically in this case, did you have a known sample of Alyce Slim?
A. Yes, I received a sample from Ms. Slim.
Q. Did you have a known sample of [redacted]?
A. Yes, I did.
Q. And how about a known sample of Lezmond Mitchell?
A. Yes, I did.
Q. And there were others; is that right?
A. Yes, there were.
MR. ALTMAN: Your Honor, may I show the witness

exhibits that have been marked 117, 118, 120 and 121? They have not been admitted yet.

THE COURT: You may.

BY MR. ALTMAN:

Q. Ms. Bock, I'm going to ask you to take a look at the screen. What I'm placing on the screen is Exhibit 117. Do you recognize what that's a photograph of?

A. Yes. It appears to be a picture of the passenger side door of the vehicle I examined.

Q. And was that an accurate depiction of the way it looked the day you examined it?

A. Yes, it is.

Q. I am going to ask you to look at 118 now. Do you recognize that?

A. Yes. It's a close-up picture of that same door.

Q. Next 120, do you recognize that?

A. Yes, I do.

Q. And what is that?

A. Again, that's a close-up picture of the door.

Q. And finally, 121, do you recognize that photograph?

A. Yes, I do.

Q. And what is it?

A. That's a close-up picture of the window from that passenger side door of the vehicle.

MR. ALTMAN: Your Honor, at this time government

would offer 117, 118, 120, and 121.

MR. SEARS: No objection, Your Honor.

(Mr. Kirby entered the courtroom.)

THE COURT: Exhibits 117, 118, 120, and 121 may be admitted.

MR. ALTMAN: Thank you. May they be published?

THE COURT: They may.

BY MR. ALTMAN:

Q. Ms. Bock, what I am going to place on the screen has just been admitted as 117. Were you able to obtain any samples or potential forensic samples from this area of the vehicle?

A. Yes, I was.

Q. And by pointing to the screen, and if you touch the screen, you can make a dot or draw. Can you indicate to the jury where these samples were collected?

A. The first sample was collected from the arm rest, this area here. The second that was listed as BB-1, a white mark lower on the armrest, that was identified as BB-1 -- excuse me, BB-2 and collected. And then there was some spatter on the inside of the window that does not show up as well on this picture, but it was in the upper area here.

Q. And you indicated something about them being listed as BB-1 and BB-2. What do you -- what is that?

A. That's just an unique identifying number. Those are my

initials and those were the first item, second item and the third item that were collected from this vehicle.
Q. And were these three samples that you collected, did they appear to you to be blood?
A. Yes, they did.
Q. And what's your process for collecting samples like this when you see them at a crime scene or in a truck like this?
A. In items like this we would moisten sterile cotton swabs with deionized water and transfer the stain from the vinyl to the -- or the glass onto those cotton swabs and allow them to dry.
Q. And that seems like it's a small amount. Is that enough to create this DNA profile that you discussed earlier?
A. Yes, it was.
Q. Do you need very much to create a DNA profile?
A. No, we can now do DNA on things people just touch. We don't actually need to have blood or their body fluids, there are a sufficient number of cells just that are transferred by someone handling something now to do DNA analysis on.
Q. Now, with these samples, Ms. Bock, that you have circled on the screen, did you compare them to known samples?
A. Yes, I did.
Q. Was one of the known samples that you compared, I guess I should say known profiles that you compared these forensic

samples to that of [redacted]?
A. Yes, it was.
Q. Was [redacted] -- well, what was your conclusion?
A. The DNA profile that was created from BB-1, BB-2, and also BB-3 matched the DNA profile from Alyce Slim at all 14 loci.
Q. And if it matches the profile of Alyce Slim in all 14 loci, what does that mean?
A. The profile occurs in one in 680 billion Navajos. So --
Q. Is that like a statistical analysis?
A. Yes.
Q. How many Navajos are there? Do you know?
A. No, I don't.
Q. Now, as to [redacted] in those samples, if it matched Alyce Slim at all 14 loci, is it safe to say that [redacted] was excluded as making or contributing to those samples?
A. That's correct.
Q. Ms. Bock, I'm going to place on the screen what's already been admitted as Exhibit 113. Do you recognize that floor mat?
A. Yes.
Q. Did you have an opportunity to examine this floor mat for potential samples?
A. Yes, I did.
Q. Were you able to obtain a sample from the floor mat?

A. Yes, I did.
Q. And create a profile of that sample?
Did you create a profile of that sample?
A. Yes, I did.
Q. Did you do a comparison with some known profiles that you had?
A. That's correct.
Q. What were your results?
A. Again, the DNA profile created from this floor mat matched Alyce Slim at all 14 loci.
Q. And again, that would indicate that that statistical analysis would be one in 680 billion Navajos?
A. That is correct.
Q. Was [redacted]'s profile noted at all in the blood that was collected from that floor mat?
A. No, it was not.
Q. Ms. Bock, I'm going to show you what's been admitted as Exhibit 107. Do you recognize 107?
A. Yes, I do.
Q. And what is it?
A. It's a portion of the fabric from the driver's seat that was collected.
Q. Is that the driver's seat or the rear seat?
A. I would have to look at another photograph, just a moment, please.

Excuse me, that's from the back passenger seat, back seat passenger side.

Q. Were you able to make a profile from any samples of blood that you collected on this exhibit?

A. Yes, I was.

Q. Did you also do a comparison to the known samples that you had in your possession?

A. Yes, I did.

Q. And what were your results?

A. That the DNA profile from this item matched that of Alyce Slim at all 14 loci.

Q. Was there any indication or profile of [redacted] in that sample collected from that item?

A. No, there was not.

Q. Now, I'm going to show you what's been admitted as Exhibit 109. Do you recognize that -- what's depicted in that photograph?

A. This is the one that was collected from the driver's seat, a portion of fabric.

Q. And was there blood detected on that fabric?

A. Yes, there was.

Q. Were you able to create a profile and compare it?

A. Yes, I was.

Q. And what were your conclusions?

A. The DNA profile created from the blood on this sample

matched Alyce Slim at all 14 loci.
Q. Now, Ms. Bock, I'm going to show you what's been admitted as Exhibit 98. Do you recognize that?
A. Yes, I do.
Q. Did you examine that blanket for -- for blood in an attempt to obtain blood samples?
A. Yes, I did.
Q. Were you able to create a profile from the sample that you obtained from that blanket?
A. Yes, I was.
Q. And did you make -- well, what -- what was your -- what was the profile of this blanket?
A. I analyzed two different areas of stain on the blanket. One of the two was a mixture of at least two individuals. Alyce Slim could not have been excluded as the major contributor to the profile of that stain at five loci. And the second area Alyce Slim could not be excluded as the major contributor at all 14 loci. In that area there were at least three individuals' DNA profile that was present but she was the major component.
Q. Now, in laymen's terms, what does that mean?
A. It means that there was DNA present. The large majority of the DNA at both areas that I sampled came from Alyce Slim.
There was DNA present from -- in one of the two

areas that I tested from two other -- at least two other individuals, possibly more, and in the other area at least one other individual, possibly more, other than Ms. Slim.
Q. Now, how about [redacted] could she be excluded from the samples taken from this blanket?
A. From the area that had blood from Ms. Slim that matched at all 14 loci, yes, she could be excluded as one of the contributors to that stain. The other area where we only -- I only obtained a partial profile that matched Ms. Slim, I cannot include or exclude her as a contributor to that stain.
Q. Ms. Bock, other than your work with the truck in this case, did you have an opportunity to analyze some knives?
A. Yes, I did.
Q. I'm going to place on the screen what's been admitted as Exhibit 37. Is that one of the knives that you analyzed?
A. It appears to be, yes.
Q. And did that knife have some sort of identifying number like you said before, BB-11 or something like that?
A. I think this is RD-25.
Q. I believe this is the black --
A. This is the black.
Q. -- butterfly knife?
A. Sorry. I can't tell quite from the screen. That would be RD-26.

Q. And were you able to obtain any samples from this knife?
A. Yes, I did find blood on the knife.
Q. And do you know where that blood was found?
A. It was found in the areas of the knife where the blade went into the handle as it's folded down or the blade slot of that knife.
Q. So on this picture, would that be in the area in between the two handles?
A. That's correct.
Q. Were you able to create a profile and compare that profile with your known samples?
A. Yes, I was.
Q. And what were your results?
A. That the DNA profile is a mixture of at least three individuals, that two individuals, Jakegory Nakai and Lezmond Mitchell, could not be excluded as contributors to the mixture at all 14 loci and that other individuals could not be excluded as minor component -- minor contributors to the mixture.
Q. What about Alyce Slim, was her profile detected at all in your analysis?
A. She is one of the individuals, Alyce Slim could not be excluded as a contributor to the mixture at 13 of the 14 loci.
Q. And, again, I guess in laymen's terms, you said that a

Nakai, Lezmond Mitchell and Alyce Slim could not be excluded. What does that mean?

A. They possessed the -- the alleles that are present in the profile. In a situation like this, where there's at least three individuals, that means that at some of these loci there may be four different -- excuse me, six different numerical assigned alleles. So they possess one -- alleles in their own profile that match those.

Say that we have six, seven, eight, nine, ten, and eleven allele, number assigned. They either have six and seven, seven and eight, eight and nine, so that they have alleles that are present in that mixture.

If they were excluded, they would not have -- they would have alleles that did not appear in that mixture. So they may have a 17 that didn't show up that we have six, seven, eight, nine, 10, 11, 12. And say they have a 13 or a 14, that allele is not shown in that mixture so they could be excluded.

Q. Let me see if I can summarize. You can't rule them out by what you found?

A. Correct. They cannot be excluded. They have the necessary alleles that were shown in the mixtures. But we can't say that it's definitely them.

Q. Now, if a knife like this were washed in a stream, based on your training and experience, it would get rid of samples

that were able to be analyzed?
A. It would probably get rid of most of the blood. But there are possibly traces of blood, depending on how well the attempt was made to clean it.
Q. And what about if it were washed in alcohol, what would that do to any sample?
A. It would denature the blood, actually it causes the blood to clot and form sort of gelatinous-type material. It would not hurt the DNA at all. Actually, alcohol is used to preserve DNA.
Q. Now, you said an attempt to wash it or washing a knife like this would get rid of some of the sample. Did you find a lot of blood on this knife?
A. No, I did not.
Q. I'm going to show you now what's been marked as Exhibit 33. Is that another knife that you analyzed in this case?
A. Yes, it is.
Q. And is that RD-25 that you discussed earlier?
A. Yes, it appears to be, yes.
Q. Were you able to find some blood or tissue to create a profile on this knife?
A. Yes, I was.
Q. And where did you find that material?
A. Again, it was present in the blade -- the slot where the blade fits into the handle. And I think on this one I also

found some in the holes along the handle. Yes, there was also some blood that was down in those indentations in the handle.

Q. And, Ms. Bock, if you could just with a line on the screen there, indicate for the jury where you found the sample?

A. Well, inside this area here, where the blade fits into the handle and then in these little holes along the knife.

Q. And again on this -- on this knife, did you find a lot of blood?

A. No. Again, there were just trace amounts of blood.

Q. But there was enough to create a profile?

A. Yes, there was.

Q. Did you compare that profile to the known samples and profiles that you had?

A. Yes, I did.

Q. And what were your results?

A. That there -- the DNA profile was a mixture of at least two individuals. And that Alyce Slim matched the major component of that profile at all 14 loci.

Q. And again, is there a statistical analysis that's developed from your comparison?

A. Yes. That major component would occur in one in 680 billion Navajos.

Q. Next I'm going to show you what's been admitted as

C E R T I F I C A T E

I, MERILYN A. SANCHEZ, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 10th day of August, 2003.

______________________________

MERILYN A. SANCHEZ, CRR

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. LEZMOND MITCHELL, Defendant. | NO. CR 01-1062 PCT-MHM<br>Phoenix, Arizona<br>May 6, 2003<br>9:21 a.m. |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(Jury Trial - Day 18)

BEFORE THE HONORABLE MARY H. MURGUIA

Court Reporter: Merilyn A. Sanchez, CRR
Sandra Day O'Connor U.S. Courthouse
401 W. Washington Street SPC-37
Phoenix, Arizona 85003-2118
(602) 322-7250

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

# A P P E A R A N C E S

| | |
|---|---|
| For the Plaintiff: | Vincent Q. Kirby, Esq.<br>Kurt M. Altman, Esq.<br>Assistant U.S. Attorneys<br>Two Renaissance Square<br>40 N. Central Avenue, Suite 1200<br>Phoenix, Arizona 85004-4408 |
| For the Defendant Mitchell: | John M. Sears, Esq.<br>107 N. Cortez, Suite 104<br>Prescott, Arizona 86301<br>Jeffrey A. Williams, Esq.<br>Gregory A. Bartolomei, Esq.<br>Assistant Federal Public Defenders<br>320 N. Central Avenue, Suite 200<br>Phoenix, Arizona 85004 |
| For the Defendant Orsinger: | Michael B. Bernays, Esq.<br>111 W. Monroe, Suite 1650<br>Phoenix, Arizona 85003-1736 |

# I N D E X


| Witness: | Direct | Cross | Redirect | Recross | VD |
|---|---|---|---|---|---|
| JERRI McLEMORE | | | | | |
| By Mr. Kirby | 3265 | | | | |
| By Mr. Sears | | 3266 | | | |
| By Mr. Kirby | 3283 | | | | |
| By Mr. Sears | | | | | 3289 |
| By Mr. Kirby | 3289 | | | | |
| By Mr. Sears | | 3350 | | | |
| By Mr. Kirby | | | 3364 | | |


# E X H I B I T S


| No. | Description | Identified | Admitted |
|---|---|---|---|
| 189 | Photograph | 3307 | 3307 |
| 192 | Photograph | 3296 | 3296 |
| 194 | Photograph | 3303 | 3304 |
| 195 | Photograph | 3298 | 3299 |
| 196 | Photograph | 3311 | 3312 |
| 197 | Diagram | 3288 | 3290 |
| 200 | Diagram | 3300 | 3301 |
| 201 | Diagram | 3305 | 3306 |
| 202 | Diagram | 3309 | 3310 |
| 210 | Photograph | 3343 | 3343 |
| 212 | Photograph | 3341 | 3342 |
| 213 | Photograph | 3281 | 3281 |
| 214 | Photograph | 3323 | 3324 |
| 216 | Diagram | 3321 | 3322 |
| 218 | Diagram | 3339 | 3340 |
| 224 | Diagram | 3344 | 3345 |


# M I S C E L L A N E O U S


Motion for Mistrial by Mr. Sears 3270
Motion for Judgment of Acquittal by Mr. Sears 3369

JERRI McLEMORE,

called as a witness herein, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. KIRBY:

Q. Good morning. Would you please give us your name.
A. Dr. Jerri McLemore.
Q. Dr. McLemore, where are you from?
A. I'm from the Office of the Medical Investigator, which is located in Albuquerque, New Mexico.
Q. And how long have you been there?
A. I've been a faculty member there for the past going on almost five years.
Q. And prior to that, where were you? What were you doing?
A. Prior to that I was actually a fellow in forensic pathology. A fellow is a medical doctor who is doing an additional year of training in a certain area and in my case that was forensic pathology. And my fellowship was also at the Office of the Medical Investigator in Albuquerque, New Mexico.
Q. Did you go to medical school?
A. Yes, I did.
Q. Where did you go?
A. I went to med school at the University of Kansas in

caused in a downward fashion?
A. Many of the wounds on the upper part of the body did have a downward direction.
Q. Now, did you also have an opportunity to examine the hands of Ms. Slim?
A. Yes.
Q. And did you notice any injuries to her hands that may have connection with her other injuries?
A. Aside, obviously, the hands, the ends of the hands had chopping defects at the area of the wrist. In addition, the fingers of the hands had sharp force injuries called incisions, meaning when a blade is drawn across the skin, and the length of the wound is longer than the depth, that's an incision. Many of the pads of the fingers, the palm aspect of the fingers had incised wounds.
MR. KIRBY: Your Honor, may the witness be shown Exhibit 201?
THE COURT: She may.
BY MR. KIRBY:
Q. Do you recognize Exhibit 201?
A. Yes, I do.
Q. What does it represent?
A. Again, this is another diagram that was made during the autopsy, again with our logo in the top right-hand corner and the name of the decedent and the case number in the

upper left-hand corner.

Q. And does this diagram show generally the injuries as found on the hands?

A. Yes, they do.

MR. KIRBY: Your Honor, I'll move the admission of Exhibit 201.

MR. SEARS: No objection.

THE COURT: 201 is admitted.

MR. KIRBY: May it be published?

THE COURT: It may.

BY MR. KIRBY:

Q. Let me start at the top where it has an R in the middle. Is that for the right hand?

A. Yes.

Q. And on the top portion of the right hand, how many incisions did you find?

A. On the back side of the hand?

Q. The back side.

A. Okay. On the back side of the hand, again, we have one, two, three, and here we've got another wound. So one, two, three, four separate sharp force injuries. This wound at the wrist again is probably more of a chopping type of injury.

Q. How about the other side of the right hand?

A. On the other side of the right hand there is one, two,

three, four, five, six, seven, eight here separate wounds. There's also a very small one at the base of the middle finger.

MR. KIRBY: Your Honor, may I approach the courtroom deputy for a minute?

THE COURT: You may.

MR. KIRBY: Your Honor, may I show the witness Exhibit 189?

THE COURT: What number was that?

MR. KIRBY: I'm sorry, 189.

THE COURT: You may.

BY MR. KIRBY:

Q. Doctor, do you recognize Exhibit 190 -- 189?

A. Yes, I do.

Q. Does that photograph show the injuries you've been describing?

A. Yes, they do.

MR. KIRBY: Your Honor, I move the admission of Exhibit 189.

MR. SEARS: No objection.

THE COURT: 189 is admitted.

MR. KIRBY: May it be published?

THE COURT: It may.

BY MR. KIRBY:

Q. Now, Doctor, the area in the photograph on what's this,

the index finger?
A. Yes.
Q. What does that represent?
A. The injury here is again an incised wound across the pad of the index finger. The -- these injuries are termed -- we use a term called defense injuries or defensive injuries simply because of the location of where these injuries occur. These are injuries in places a person might be expected to get injuries if they were fending off an attack.
Q. Would this be consistent with the attempted grabbing of a knife?
A. It could be.
Q. Let me go back to 201 which is in. And the lower half of the diagram has an L between the diagrams of the hands. It would be the left hand?
A. That's correct.
Q. And would you tell us then on the, let's start with the palm of the hand, were there any injuries noted on the palm of the hand?
A. No.
Q. How about on the back side of the hand?
A. On the back side of the hand, again, there's a very large combined tearing and cutting of the skin here that was consistent with being associated with the chopping injuries at the wrist.

There was a very large area of again incised wounds on the pinkie side of the back of the hand. There were additional, again, injuries, one here on the hand knuckle of the index finger. Again, involving the index finger itself, similar tears and sharp force injuries of the thumb, and a wound near the hand knuckle of the middle finger.

Q. In total, how many incised injuries did you find on the top of the left hand?

A. In total, the number of incised wounds of the left hand were, again, counting them up, one, two, three, four, approximately six or -- six separate wounds.

Q. Was anything about the patterns or the locations of that that were consistent with your experience in defensive wounds?

A. Again, because these are occurring on the hand, even though they are on the back of the hand, these are injuries that may be inflicted when a person is trying to fend off an attack.

MR. KIRBY: Your Honor, may I show the witness Exhibit 202?

THE COURT: You may.

BY MR. KIRBY:

Q. Doctor, do you recognize Exhibit 202?

A. Yes.

which was then within a sealed box.

MR. KIRBY: Your Honor, may we show the witness Exhibit 161 and 162?

THE COURT: 161 and 162, can we use Agent Duncan.

BY MR. KIRBY:

Q. Do you have 161 in front of you?

A. Yes.

Q. Does 161 appear to be similar or the same rock that you observed at the office?

A. Yes.

Q. 162?

A. Yes.

Q. Does that appear to be the same as the rock that you analyzed or took a look at?

A. Yes, it is.

Q. Was there anything on those rocks as you looked at them that appeared related to this -- to your examination?

A. On the rock edges, there appeared to be some red staining and a few dark hairs.

Q. Doctor, you talked about force used to fracture the skull. Are those rocks individually capable, in your opinion, of causing that kind of fracture?

A. From my memory looking at the rocks, these were fairly heavy pieces of stone. They certainly could have produced the injuries to the head.

Q. Can you give us a comparison, based on your experiences, of the kind of force that this would be similar to?

A. The fact that the side of the skull, again using the schematic diagram, the side of the skull had multiple fractures that we call comminuted fractures meaning they form smaller bits, fragments of bone. And the fact that this one fracture is extending across the front part of the skull, which is called the frontal bone and the frontal bone is normally fairly thick bone, this took a considerable amount of force. I've seen skull fractures like this in people who have been ejected from high-speed motor vehicle accidents.

Q. Doctor, these injuries you've described around the skull, were they antemortem, postmortem?

A. The injuries to the brain, there were bruises that had -- that were already forming on the brain. That's consistent with antemortem or antemortem or perimortem injuries. Certainly enough -- certainly when a person is alive and can form a reaction to these injuries.

Q. What actually caused death in this case?

A. From taking the entire findings of the examination, the cause of death in this particular case was certainly the injuries to the head, the fractures, the bruising of the brain, and the injuries on the side of the head.

Q. What did these injuries do to the brain that would cause

(The court stood in recess.)

* * *

C E R T I F I C A T E

I, MERILYN A. SANCHEZ, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 17th day of August, 2003.

______________________________

MERILYN A. SANCHEZ, CRR

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

---

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>LEZMOND MITCHELL,<br><br>Defendant. | NO. CR 01-1062 PCT-MHM<br><br>Phoenix, Arizona<br>May 7, 2003<br>9:35 a.m. |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(Jury Trial - Day 19)

BEFORE THE HONORABLE MARY H. MURGUIA

Court Reporter: Merilyn A. Sanchez, CRR
Sandra Day O'Connor U.S. Courthouse
401 W. Washington Street SPC-37
Phoenix, Arizona 85003-2118
(602) 322-7250

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

# APPEARANCES

For the Plaintiff:

Vincent Q. Kirby, Esq.
Kurt M. Altman, Esq.
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408

For the Defendant Mitchell:

John M. Sears, Esq.
107 N. Cortez, Suite 104
Prescott, Arizona 86301

Jeffrey A. Williams, Esq.
Gregory A. Bartolomei, Esq.
Assistant Federal Public Defenders
320 N. Central Avenue, Suite 200
Phoenix, Arizona 85004

THE COURT: But at this point, we are going to bring in the jury. Let me just one other thing -- well, I can do it later. Go ahead. Bring in the jury.

(The jury entered the courtroom.)

THE COURT: The record should reflect the presence of the defendant and counsel and the jury. I apologize for the delay this morning. I appreciate your patience.

Let me tell you a little bit about the schedule today. I am going to read some instructions to you. We will break for lunch, and then we will begin the closing arguments. The government will go first, then the defense will respond, and then the government has the opportunity to rebut because it carries the burden of proof in this case.

But in order not to separate out the arguments, I am going to go ahead and do the first part of the instructions and then we will break for lunch and then we will resume with the closing arguments after lunch.

As you know, both sides have rested. And so, members of the jury, now that you have heard all of the evidence, it is my duty to instruct you on the law which applies to this case. A copy of these instructions will be available in the jury room for you to consult.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law

as I give it to you. You must follow the law as I give it to you, whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath promising to do so at the beginning of the case.

In following my instructions, you must follow all of them and not single out some and ignore others. They are all equally important. You must not read into these instructions or into anything the Court may have said or done any suggestion as to what verdict you should return. That is a matter entirely up to you.

The Indictment is not evidence. The defendant has pleaded "not guilty" to the charges. The defendant is presumed to be innocent and does not have to testify or present any evidence to prove innocence. The government has the burden of proving every element of the charges beyond a reasonable doubt.

A defendant in a criminal case has a Constitutional right not to testify. No presumption of guilt may be raised, and no inference of any kind may be drawn, from the fact that the defendant did not testify.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced that the defendant is guilty.

C E R T I F I C A T E

I, MERILYN A. SANCHEZ, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 18th day of August, 2003.

MERILYN A. SANCHEZ, CRR

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

UNITED STATES OF AMERICA, )
)
)
Plaintiff, )
)
vs. ) NO. CR 01-1062 PCT-MHM
)
LEZMOND MITCHELL, ) Phoenix, Arizona
) May 16, 2003
) 9:50 a.m.
Defendant. )
)

REPORTER'S REDACTED TRANSCRIPT OF PROCEEDINGS

(Jury Trial - Day 25)

BEFORE THE HONORABLE MARY H. MURGUIA

Court Reporter: Merilyn A. Sanchez, CRR
Sandra Day O'Connor U.S. Courthouse
401 W. Washington Street SPC-37
Phoenix, Arizona 85003-2118
(602) 322-7250

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

# A P P E A R A N C E S

| | |
|---|---|
| For the Plaintiff: | Vincent Q. Kirby, Esq.<br>Kurt M. Altman, Esq.<br>Assistant U.S. Attorneys<br>Two Renaissance Square<br>40 N. Central Avenue, Suite 1200<br>Phoenix, Arizona 85004-4408 |
| For the Defendant Mitchell: | John M. Sears, Esq.<br>107 N. Cortez, Suite 104<br>Prescott, Arizona 86301<br>Jeffrey A. Williams, Esq.<br>Gregory A. Bartolomei, Esq.<br>Assistant Federal Public Defenders<br>320 N. Central Avenue, Suite 200<br>Phoenix, Arizona 85004 |

that the defendant should be sentenced to death, then you may not impose the death penalty. In that event, the jury must consider the only alternative available, life imprisonment without any possibility of release.

If the jury decides unanimously that the defendant should be sentenced to life imprisonment without the possibility of release, please so indicate in Section IV(d) of the Special Verdict Forms.

Before you reach any conclusion based on a lack of unanimity, you should continue your discussions until you are fully satisfied that no further discussion will lead to a unanimous decision. If you conclude that a unanimous decision cannot be reached, please so indicate in Section IV(d) of the Special Verdict Forms.

As I have told you previously, if you unanimously decide to impose the death penalty, I am required by law to abide by your decision and to sentence the defendant accordingly. In other words, if you sentence the defendant to death, I cannot change your sentence.

Finally -- finally, in your consideration of whether the death sentence is appropriate, you must not consider the race, color, religious beliefs, national origin, or sex of either the defendant or the victims. You are not to return a sentence of death unless you would return a sentence of death for the crime in question without

regard to race, color, religious beliefs, national origin or sex of either the defendant or any victim.

To emphasize the importance of this consideration, Section VII of the Special Verdict Forms contains a certification statement. Each juror should carefully read the statement and sign your name in the appropriate place if the statement accurately reflects the manner in which you reach your individual decision.

At this time, I would like to see the attorneys at side bar.

(The following discussion was held at the bench between Court and counsel:)

THE COURT: Is that off?

MR. ALTMAN: It is.

THE COURT: It's 11:30. Do you want to do your first part or do you want to wait until after lunch?

MR. SEARS: Let's have lunch.

MR. BARTOLOMEI: Let's get it over with.

MR. ALTMAN: Get off my foot.

Judge, I would rather wait. I would rather not go up until 12:30 or so. I would like to get it done, but I think it would be better for them to wait.

THE COURT: That's fine. We will come back at 12:30. That way we will flow.

MR. ALTMAN: That would be fine.

CERTIFICATE

I, MERILYN A. SANCHEZ, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 21st day of August, 2003.

______________________________

MERILYN A. SANCHEZ, CRR

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR 01-1062 PCT-MHM |
| | ) | |
| LEZMOND MITCHELL, | ) | Phoenix, Arizona |
| | ) | May 20, 2003 |
| | ) | 3:37 p.m. |
| Defendant. | ) | |
| | ) | |

REPORTER'S REDACTED TRANSCRIPT OF PROCEEDINGS

(Jury Trial - Day 26)

BEFORE THE HONORABLE MARY H. MURGUIA

Court Reporter: Merilyn A. Sanchez, CRR
Sandra Day O'Connor U.S. Courthous
401 W. Washington Street SPC-37
Phoenix, Arizona 85003-2118
(602) 322-7250

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

A P P E A R A N C E S

For the Plaintiff:

Vincent Q. Kirby, Esq.
Kurt M. Altman, Esq.
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408

For the Defendant Mitchell:

John M. Sears, Esq.
107 N. Cortez, Suite 104
Prescott, Arizona 86301
Jeffrey A. Williams, Esq.
Gregory A. Bartolomei, Esq.
Assistant Federal Public Defenders
320 N. Central Avenue, Suite 200
Phoenix, Arizona 85004

P R O C E E D I N G S

THE COURT: The record should reflect the presence of the defendant and counsel.

I've been notified that we have a verdict. Before I bring in the jury, I need to see if there's anything we need to discuss. I see that the defendant is here and properly dressed. So I take it the defendant is not planning to waive his presence for the reading of the verdict; is that correct?

MR. SEARS: That's correct, Your Honor. We are ready to proceed.

THE COURT: Government?

MR. KIRBY: We are ready.

THE COURT: Let me just explain to you what will happen after the verdict is read. I will ask the parties if there's any polling that the parties would request. And then I will indicate to them that the admonition is now lifted and that they are free to discuss the case. But that no one, if they choose not to, they do not have to discuss the case.

I will tell them that you will be standing out in the hallway once they are released. If you wish to discuss the case -- if they wish to discuss the case with you, they can. They can approach you, but you all are not to approach

them. Is that understood?

MR. KIRBY: Yes, Your Honor.

MR. SEARS: Yes, Your Honor.

MR. BARTOLOMEI: Yes, Judge.

THE COURT: Before they go out there, I will thank them personally for their service. So it might be a few minutes. And then they will come out, okay? Okay?

MR. KIRBY: Yes, Your Honor.

MR. SEARS: Thank you, Your Honor.

MR. BARTOLOMEI: Thank you, Judge.

THE COURT: Please bring in the jury.

(The jury entered the courtroom.)

THE COURT: The record should reflect the presence of the defendant, counsel, and the jury.

Has the jury reached a verdict?

JURY FOREPERSON: Yes, Your Honor, we have.

THE COURT: Please hand the verdict forms to the bailiff.

The clerk will read and record the verdict.

THE CLERK: United States of America, plaintiff versus Lezmond Mitchell, defendant.

Special Sentencing Verdict Form for the death of Alyce Slim. Section I, age of defendant. Do you, the jury, duly empaneled and sworn in the above-entitled cause, unanimously find that the government has proved beyond a

reasonable doubt that the defendant was 18 years of age or older at the time of the offense?

Yes.

Section II, gateway intent factors. A, do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Lezmond Mitchell, intentionally killed Alyce Slim?

Yes.

B, do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Lezmond Mitchell, intentionally inflicted serious bodily injury which resulted in the death of Alyce Slim?

Yes.

C, do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Lezmond Mitchell, participated in an act contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person other than himself which resulted in the death of Alyce Slim?

Yes.

D, do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Lezmond Mitchell, intentionally and

specifically engaged in an act of violence knowing that the act created a grave risk of death to a person other than himself such that participation in the act constituted a reckless disregard for human life and resulted in the death of Alyce Slim?

Yes.

Section III, statutory aggravating factors. A, do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Lezmond Mitchell, killed Alyce Slim as consideration for the receipt or in the expectation of the receipt of anything of pecuniary value?

Yes.

B, do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Lezmond Mitchell, killed Alyce Slim in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse?

Yes.

C, do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Lezmond Mitchell, committed the offense after substantial planning and premeditation?

Yes.

D, do you, the jury, unanimously find that the

government has established beyond a reasonable doubt that Alyce Slim was vulnerable due to age or infirmity?

Yes.

E, do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Lezmond Mitchell, intentionally killed more than one person in a single criminal episode?

Yes.

Section IV, nonstatutory aggravating factors. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Lezmond Mitchell, caused injury, harm, and loss to the family of Alyce Slim?

Yes.

Section V, mitigating factors. A, Lezmond Mitchell does have a significant prior criminal record?

Number of jurors who so find, 12.

B, another person equally culpable in the crime will not be punished by death.

Number of jurors who so find, 12.

C, Lezmond Mitchell will be sentenced to life in prison without any possibility of release if he is not sentenced to death.

Number of jurors who so find, 12.

D, Lezmond Mitchell has invariably responded well

to structured environments and would likely make an excellent adaptation to prison if he were sentenced to life imprisonment without possibility of release.

Number of jurors who so find, 2.

E, Lezmond Mitchell's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired regardless of whether his capacity was so impaired as to constitute a defense to the charge.

Number of jurors who so find, 1.

F, other factors in Lezmond Mitchell's childhood background, record, character, or any other circumstance of the offense that might mitigate against imposition of a death sentence.

Number of jurors who so find, 6.

THE COURT: Grace, can you read that one again. Read it again.

THE CLERK: A, Lezmond Mitchell does not have a significant prior criminal record.

Number of jurors who so find, 12.

THE COURT: You may proceed.

THE CLERK: Item G, letter from Navajo Nation Department of Justice, Office of Attorney General dated January 22, 2002.

Number of jurors who so find, 7.

Section VI, determination of sentence. VI(d), we, the jury, unanimously find that the aggravating factors found to exist sufficiently outweigh any mitigating factors found to exist or in the absence of a mitigating factor that the aggravating factors alone are sufficient to justify a sentence of death. We, therefore, vote unanimously that defendant, Lezmond Mitchell, shall be sentenced to death for the death of Alyce Slim.

Signed by each of the jurors and the jury foreperson and dated May 20th, 2003.

Section VII, certification of the nondiscrimination also signed by each juror and the foreperson and dated May 20th, 2003.

Special Sentencing Verdict Form for the death of [redacted] Section I, age of defendant. Do you, the jury, duly empaneled and sworn in the above-entitled cause unanimously find that the government has proved beyond a reasonable doubt that the defendant was 18 years of age or older at the time of the offense?

Yes.

Section II, gateway intent factors. A, do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Lezmond Mitchell, intentionally killed [redacted]?

Yes.

B, do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Lezmond Mitchell, intentionally inflicted serious bodily injury which resulted in the death of [redacted]?

Yes.

C, do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Lezmond Mitchell, participated in an act contemplating that the life of a person will be taken or intending that lethal force would be used in connection with a person other than himself which resulted in the death of [redacted]?

Yes.

D, do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Lezmond Mitchell, intentionally and specifically engaged in an act of violence knowing the act created a grave risk of death to a person other than himself such that participation in the act constituted a reckless disregard for human life and resulted in the death of [redacted]?

Yes.

Section III, statutory aggravating factors. A, do you, the jury, unanimously find that the government has

established beyond a reasonable doubt that the defendant, Lezmond Mitchell, killed [redacted] as consideration for the receipt or in the expectation of the receipt of anything of pecuniary value?

Yes.

B, do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Lezmond Mitchell, killed [redacted] in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse?

Yes.

C, do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Lezmond Mitchell, committed the offense after substantial planning and premeditation?

Yes.

D, do you, the jury, unanimously find that the government has established beyond a reasonable doubt that [redacted] was vulnerable due to age or infirmity?

Yes.

E, do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Lezmond Mitchell, intentionally killed more than one person in a single criminal episode?

Yes.

F, do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Lezmond Mitchell, killed [redacted] during the commission of the offense of kidnapping?

Yes.

Section IV, nonstatutory aggravating factors. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Lezmond Mitchell, caused injury, harm, and loss to the family of [redacted]?

Yes.

Section V, mitigating factors. A, Lezmond Mitchell does not have a significant prior criminal record.

Number of jurors who so find, 12.

B, another person equally culpable in the crime will not be punished by death.

Number of jurors who so find, 12.

C, Lezmond Mitchell will be sentenced to life in prison without any possibility of release if he is not sentenced to death.

Number of jurors who so find, 12.

D, Lezmond Mitchell has invariably responded well to structured environments and would likely make an excellent adaptation to prison if he were sentenced to life imprisonment without possibility of release.

Number of jurors who so find, 2.

E, Lezmond Mitchell's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired regardless of whether his capacity was so impaired as to constitute a defense to the charge.

Number of jurors who so find, 1.

F, other factors in Lezmond Mitchell's childhood background, record, character, or any other circumstance of the offense that mitigate against imposition of the death sentence.

Number of jurors who so find, 6.

And factor D, letter from Navajo Nation Department of Justice, Office of Attorney General dated January 22nd, 2002.

Number of jurors who so find, 7.

Section VI, determination of sentence. D, we, the jury, unanimously find that the aggravating factors found to exist sufficiently outweigh any mitigating factors found to exist or in the absence of the mitigating factors that the aggravating factors alone are sufficient to justify a sentence of death. We, therefore, vote unanimously that defendant, Lezmond Mitchell, shall be sentenced to death for the death of [redacted].

Signed by each of the jurors and the jury

foreperson and dated May 20, 2003.

Section VII, certification regarding discrimination is signed by all of the jurors and the jury foreperson and dated May 20th, 2003.

THE COURT: Do counsel wish to poll the jury?

MR. SEARS: Yes, Your Honor.

THE COURT: Members of the jury, you will each be asked a question by the clerk. Please answer it yes or no.

THE CLERK: Is this your true verdict and the verdict of the jury, [redacted]?

JUROR [redacted]: Yes.

THE CLERK: [redacted]?

JUROR [redacted]: Yes.

THE CLERK: [redacted]?

JUROR [redacted]: Yes.

THE CLERK: [redacted]?

JUROR [redacted]: Yes.

THE CLERK: [redacted]?

JUROR [redacted] Yes.

THE CLERK: [redacted]?

JUROR [redacted]: Yes.

THE CLERK: [redacted]?

JUROR [redacted]: Yes.

THE CLERK: [redacted]?

JUROR [redacted] Yes.

THE CLERK: [redacted]?

JUROR [redacted]: Yes.

THE CLERK: [redacted]?

JUROR [redacted]: Yes.

THE CLERK: [redacted]?

JUROR [redacted]: Yes.

THE CLERK: [redacted]?

JUROR [redacted]: Yes.

THE COURT: Members of the jury, on behalf of all the participants in the trial, I want to thank you for your service to the parties and to the community. I understand how difficult this case has been for you and for your families. The schedule that was presented to you and your compliance with it is greatly appreciated.

The admonition is now lifted. You are free to talk about the case with anyone or not talk about it as you wish. If someone asks you about the case, and you don't want to talk about it, just advise them of the fact and they will honor your request.

The lawyers will be standing in the hallway as you exit. If you choose to talk to them, if you have any questions for them, you may approach them and ask them questions. They've been instructed not to approach you. It's only if you want to talk or discuss the case with lawyers on either side as you wish, you may do. So if you

decide to just exit the building, you may.

I will -- you will be sent back to the jury room momentarily. I will come back and thank you personally for your service. Please leave your juror badges and your notebooks. The bailiff will destroy your notes. But the badges and books will be used in other cases.

Thank you once again. Your jury service is now complete and you are excused.

All rise for the jury.

(The jury left the courtroom.)

THE COURT: Thank you. You may be seated. Sentencing date -- sentencing date is set for August the 4th at 10:00 a.m.

Is there anything else at this time?

MR. KIRBY: No, Your Honor.

MR. SEARS: No, Your Honor.

MR. KIRBY: Thank you.

MR. SEARS: Thank you.

(The court stood in recess.)

* * *

C E R T I F I C A T E

I, MERILYN A. SANCHEZ, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 21st day of August, 2003.

MERILYN A. SANCHEZ, CRR

CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*s/ William G. Voit*
WILLIAM G. VOIT
Assistant U.S. Attorney