CA No. 18-17031

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

LEZMOND CHARLES MITCHELL,

Movant-Appellant,

v.

UNITED STATES OF AMERICA,

Respondent-Appellee.

DC No. 3:09-cv-08089-DGC
(Criminal No. 3:01-cr-01062-DGC)

**DEATH PENALTY CASE**

# APPELLANT'S REPLY BRIEF

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

The Honorable David G. Campbell
United States District Judge

AMY M. KARLIN
Interim Federal Public Defender
CELESTE BACCHI
JONATHAN C. AMINOFF
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-1887
Facsimile: (213) 894-0310
Email: Celeste_Bacchi@fd.org

Attorneys for Movant-Appellant
LEZMOND CHARLES MITCHELL

# TABLE OF CONTENTS

**Page**

I. ARGUMENT ..... 1

A. Mitchell's Request to Interview His Jurors Was Properly Raised in a Rule 60 Motion and Was Not a Disguised Second or Successive Section 2255 Motion ..... 1

B. The District Court Abused Its Discretion in Denying Mitchell's Rule 60(b)(6) Motion ..... 9

1. Barring criminal defendants from access to their trial jurors, particularly in death penalty cases, thwarts the goals of *Peña-Rodriguez* ..... 9

2. *Peña-Rodriguez* establishes that traditional safeguards against racial bias are lacking, and the district court abused its discretion in finding that those safeguards provided adequate protection in this case ..... 14

C. This Court Should Grant Mitchell's Rule 60(b) Motion ..... 19

II. CONCLUSION ..... 22

CERTIFICATE OF COMPLIANCE ..... 23

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Arizona v. California*,
460 U.S. 605 (1983)....................20

*Balentine v. Thaler*,
626 F.3d 842 (5th Cir. 2014)....................8

*Brumfield v. Cain*,
135 S. Ct. 2269 (2015)....................2

*Buck v. Thaler*,
345 Fed. Appx. 923 (5th Cir. 2009)....................5, 6, 12

*Butz v. Mendoza-Powers*,
474 F.3d 1193 (9th Cir. 2007)....................6

*Christeson v. Roper*,
135 S. Ct. 891 (2015)....................20

*Coleman v. Thompson*,
501 U.S. 722 (1991)....................5

*Douglas v. California*,
372 U.S. 353 (1963)....................13

*Evitts v. Lucey*,
469 U.S. 387 (1985)....................14

*Furman v. Georgia*,
408 U.S. 238 (1972)....................12

*Gonzalez v. Crosby*,
545 U.S. 524 (2005)....................*passim*

*Gregg v. Georgia*,
428 U.S. 153 (1976)....................12

*Hansen & Rowland v. C.F. Lytle Co.*,
167 F.2d 998 (9th Cir. 1948)....................3

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Herrera v. Collins*,
506 U.S. 390 (1993)....................12

*Hill v. Colorado*,
530 U.S. 703 (2000)....................13

*Luis v. United States*,
136 S. Ct. 1083 (2016)....................13

*Martinez v. Ryan*,
566 U.S. 1 (2012)....................5

*Mitchell v. Rees*,
261 Fed. Appx. 825 (6th Cir. 2008)....................7

*Morgan v. Illinois*,
504 U.S. 719 (1992)....................16

*Peña-Rodriguez v. Colorado*,
137 S. Ct. 855 (2017)....................*passim*

*Phelps v. Alameida*,
569 F.3d 1120 (9th Cir. 2009)....................7, 19

*In re Rainbow Magazine, Inc.*,
77 F.3d 278 (9th Cir. 1996)....................20, 21

*Reyes v. Artuz*,
2017 U.S. Dist. LEXIS 149517 (S.D.N.Y. 2017)....................7

*Rhines v. Young*,
Case No. 18-2376 (8th Cir. 2018)....................19

*Ritter v. Smith*,
811 F.2d 1401 (11th Cir. 1987)....................19

*Strickland v. Washington*,
466 U.S. 668 (1984)....................5

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Tanner v. United States*,
483 U.S. 107 (1987) ........ 14, 15

*Tharpe v. Sellers*,
138 S. Ct. 545 (2018) ........ 18, 19

*Thomas v. Bible*,
983 F.2d 152 (9th Cir. 1993) ........ 3

*Trevino v. Thaler*,
569 U.S. 413 (2013) ........ 5

*United States v. Buenrostro*,
638 F.3d 720 (9th Cir. 2011) ........ 1

*United States v. Hill*,
915 F.3d 669 (9th Cir. 2019) ........ 2

*United States v. Mitchell*,
502 F.3d 931 (9th Cir. 2007) ........ 17

*United States v. Vialva*,
904 F.3d 356 (5th Cir. 2018) ........ 6

*United States v. Washington*,
653 F.3d 1057 (9th Cir. 2011) ........ 1

*Wellons v. Hall*,
558 U.S. 220 (2010) ........ 4

*Woodson v. North Carolina*,
428 U.S. 280 (1976) ........ 12

### FEDERAL STATUTES, RULES, AND CONSTITUTION

D. Ariz. Loc. Civ. R. 39.2 ........ 11

D. Ariz. Loc. Civ. R. 39.2(b) ........ 11

D. Ariz. Loc. Crim. R. 24.2 ........ 12

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL STATUTES, RULES, AND CONSTITUTION

D. Mont. Loc. Civ. R. 48.1(b)....................12

D. Mont. Loc. Crim. R. 24.2(b)....................12

Fed. R. Civ. P. 60....................*passim*

Fed. R. Civ. P. 60(b)....................*passim*

Fed. R. Evid. 606(b)....................9, 10, 13

U.S. Const. amend. VI....................*passim*

U.S. Const. amend. VIII....................12

U.S.C.A. § 2255(h)....................8

## MISCELLANEOUS

http://www.cjcj.org/news/8113 (last visited October 10, 2019)....................17

https://www.smithsonianmag.com/history/decades-us-government-forcibly-placed-native-students-western-schools-effects-felt-today-180959502/ (last visited October 10, 2019)....................18

# I. ARGUMENT

## A. Mitchell's Request to Interview His Jurors Was Properly Raised in a Rule 60 Motion and Was Not a Disguised Second or Successive Section 2255 Motion

The Supreme Court has not adopted a bright-line rule for distinguishing between a bona fide Rule 60(b) motion and a disguised second or successive § 2255 motion. *United States v. Washington*, 653 F.3d 1057, 1063 (9th Cir. 2011). Generally speaking, an argument that attacks "some defect in the integrity of the federal habeas proceedings" is properly raised in a Rule 60 motion, which "has an unquestionably valid role to play in habeas cases." *Gonzalez v. Crosby*, 545 U.S. 524, 532, 534 (2005); *accord United States v. Buenrostro*, 638 F.3d 720, 722 (9th Cir. 2011) (observing that a defect in the integrity of a habeas proceeding requires a showing that something happened during that proceeding "that rendered its outcome suspect"). In contrast, if the motion raises a claim, which is defined as "'an asserted federal basis for relief from a . . . judgment of conviction,' then it is, in substance, a new request for relief on the merits" that should be treated as a second or successive § 2255 motion. *Washington*, 653 F.3d at 1063.

The district court correctly found that Mitchell's Rule 60(b) motion "does not seek to vindicate a substantive claim." 1ER 4. Rather, Mitchell "is seeking only to investigate, as a preliminary matter, whether a substantive claim exists." *Id.* And in the proceedings before the district court, Respondent *agreed* that

Mitchell's Rule 60(b) motion "attack[s] a procedural ruling. . . ." 2ER 97. Respondent made much of the fact that the district court, in denying Mitchell's § 2255 motion, "already held that Mitchell's complaints about the denial of juror interviews *failed to state a claim upon which collateral relief might lie*." *Id.* (emphasis added); *see also* 1ER 9-10 ("Because this claim alleges error in a postconviction proceeding, not at trial or sentencing, this Court concludes that it fails to state a cognizable claim for relief under Sec. 2255.")

Now, for the first time on appeal, Respondent argues, incorrectly, that Mitchell's Rule 60(b) motion and related litigation have been making a substantive claim all along. (Dkt. 1 at 15-18.) Respondent accuses Mitchell of wanting to "have it both ways" by claiming procedural error but actually alleging a substantive habeas claim, and argues that Mitchell's Rule 60(b) claim "is a quintessential 'assert[ion] that a previous ruling regarding one of [the habeas grounds] was in error.'" (*Id.* at 18 (quoting *Gonzalez*, 545 U.S. at 532 & n.4).)

There are several problems with Respondent's present line of reasoning. First, because Respondent failed to make this argument below, it is "properly deemed waived" and this Court should not address it. *Brumfield v. Cain*, 135 S. Ct. 2269, 2282 (2015) (finding that the State waived an argument that § 2254 barred relief by failing to raise it in the lower courts and in its brief in opposition) (internal quotations and citations omitted)); *United States v. Hill*, 915 F.3d 669,

670 n.1 (9th Cir. 2019) (refusing to address an argument raised for the first time in the Government's responsive brief on appeal).

Second, Respondent's argument is barred by the law of the case doctrine. When Mitchell raised this issue as a constitutional claim for relief in his § 2255 motion, the district court held that the issue was not a cognizable claim for relief, but rather just a claimed "error in a postconviction proceeding." 1ER10. That RULING was left undisturbed by this Court on appeal. The law of the case doctrine generally precludes reconsideration of "an issue that has already been decided by the same court, or a higher court in the identical case." *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993). In a circumstance like this, "a judgment of reversal by an appellate court is an adjudication only of matters expressly discussed and decided, which become the law of the case in further proceedings on remand and re-appeal." *Hansen & Rowland v. C.F. Lytle Co.*, 167 F.2d 998, 999 (9th Cir. 1948). The district court's ruling is thus law of the case. Respondent does not argue that this ruling is exempted from the law of the case doctrine, and thus Respondent's attempt to now re-characterize Mitchell's argument as one of substantive relief is barred by the law of the case doctrine.

More importantly, Respondent's position is unsupported by the facts and the law. Mitchell's Rule 60(b) motion challenges a procedural ruling—the denial of his motion to interview jurors—that deprived Mitchell of his ability to investigate

potential claims which would have been brought in his section 2255 motion. The motion does not ask the court to revisit a denial on the merits of a claim, but rather to revisit a procedural denial that is similar to, though not exactly the same as, a request for discovery. It is well-settled law that a discovery denial is not a denial of a claim on the merits. *See, e.g.*, *Wellons v. Hall*, 558 U.S. 220, 223 (2010) (per curiam) (distinguishing a denial of habeas relief from the denial of discovery or an evidentiary hearing). Indeed, in *Gonzalez*, the Supreme Court explained that, in the context of Rule 60 motions, a denial of a claim "on the merits" refers "to a determination that there exist or do not exist grounds entitling a petitioner to habeas corpus relief. . . ." *Gonzalez*, 545 U.S. at 532 n.4. While there are undoubtedly constitutional dimensions to the denial of Mitchell's request to interview jurors, his subsequent challenges to that denial are not habeas claims because precluding him from having access to jurors would not, standing alone, entitle him to habeas relief. *See* 1ER 4 ("Petitioner does not seek to vindicate a substantive claim. . . . Only if he discovered evidence of juror bias would he then file a substantive claim.").

Even if Mitchell's challenge to the denial of his motion to interview jurors could somehow be construed as a substantive habeas claim, the Supreme Court has recognized that a petitioner can raise a substantive claim in habeas, and later challenge the *procedural* aspects of the denial of that claim in a Rule 60(b)(6)

motion. For example, in *Buck v. Davis*, petitioner Buck failed to timely raise a *Strickland*[1] claim during his state post-conviction proceedings. 137 S. Ct. 759, 770 (2017). That claim was later found to be procedurally defaulted in federal habeas pursuant to *Coleman v. Thompson*, 501 U.S. 722 (1991), which held that an attorney's failure to raise an ineffective assistance claim during state post-conviction review could not constitute cause for a procedural default. *Id*. Buck sought review of the district court's ruling, but the Fifth Circuit denied his application for a COA. *Buck v. Thaler*, 345 Fed. Appx. 923 (5th Cir. 2009) (per curiam). Subsequently, the Supreme Court's decisions in *Martinez v. Ryan*, 566 U.S. 1 (2012) and *Trevino v. Thaler*, 569 U.S. 413 (2013) modified the rule of *Coleman* such that Buck's *Strickland* claim would have been heard on the merits provided he could show that state habeas counsel was constitutionally ineffective for failing to raise the claim, and that the underlying claim had some merit. Buck then sought to reopen his federal habeas case under Rule 60(b)(6), arguing, *inter alia*, that the change in law affected by *Martinez* and *Trevino* called into question the procedural denial of his substantive *Strickland* claim, because if those cases had been decided earlier, they would have permitted federal review of Buck's

---

[1] *Strickland v. Washington*, 466 U.S. 668 (1984) (establishing the standard for determining when a criminal defendant's Sixth Amendment right to counsel is violated by counsel's constitutionally ineffective performance).

defaulted claim. *Buck*, 137 S. Ct. at 772. While the federal district court and the Fifth Circuit denied relief under Rule 60(b), both courts recognized that Buck's challenge was properly raised in the 60(b) context and was not an impermissible second or successive habeas claim. The Supreme Court followed suit, ultimately granting Buck relief under Rule 60(b).

Like the petitioner in *Buck*, Mitchell's Rule 60(b) motion challenges a procedural ruling that had ramifications for his substantive habeas petition. This is a permissible use of Rule 60(b). *Gonzalez*, 545 U.S. at 532 nn.4-5; *see also Butz v. Mendoza-Powers*, 474 F.3d 1193 (9th Cir. 2007) (finding a Rule 60(b) motion not to be the equivalent of a second or successive petition where the district court dismissed the first petition for failure to pay a filing fee or comply with court orders and did not reach merits of claims); *United States v. Vialva*, 904 F.3d 356, 361 (5th Cir. 2018) ("Rule 60(b) motions can legitimately ask a court to reevaluate already-decided claims—as long as the motion credibly alleges a non-merits defect in the prior habeas proceedings.").

Finally, Respondent argues that Mitchell's challenge to the denial of his request to interview jurors is an improper second or successive habeas claim because there is no right to discovery in habeas without showing that the discovery request is tied to developing a substantive claim for relief. (Dkt. 21 at 20-21.) According to Respondent, this limitation on habeas discovery "is why motions

purporting to merely investigate whether claims exist nevertheless are subject to the second or successive bar." (*Id.* at 20.) (citing *In re Robinson*, 917 F.3d 856, 865 (5th Cir. 2019)). But courts have found that Rule 60(b)(6) is properly invoked when a movant seeks to re-open the case based on the district court's wrongful denial of discovery. *See Mitchell v. Rees*, 261 Fed. Appx. 825 (6th Cir. 2008) (the district court's failure to grant an evidentiary hearing was a proper use of a Rule 60(b) motion); *Reyes v. Artuz*, 2017 U.S. Dist. LEXIS 149517 (S.D.N.Y. 2017) (permitting a challenge to the denial of a discovery order to be raised in a Rule 60(b)(6) motion).

Moreover, Respondent's line of reasoning is not supported by *Gonzalez*. Because Rule 60 motions are geared towards procedural issues, once granted they frequently create the possibility of raising new claims. *See, e.g.*, *Gonzalez*, 545 U.S. 524 (finding a motion challenging a district court's timeliness finding was validly raised under Rule 60 which, if ultimately granted, could open the door to an amended petition raising new claims). Juror interviews could result in the creation of new claims which would then have to be litigated in a habeas petition, but such an outcome would not violate the rules governing second or successive habeas petitions. As long as the motion does not present a new claim for relief, or seek to present new evidence in support of a claim already litigated, it should be permitted to proceed under Rule 60(b). *See Phelps v. Alameida*, 569 F.3d 1120, 1128 (9th

Cir. 2009) (petitioner was permitted to challenge the timeliness of his federal habeas petition in a Rule 60(b) motion, even though granting the motion would result in his previously dismissed claims being heard). Other circuits have acknowledged that Rule 60 motions are appropriate even when they will result in claims for relief being presented to the court. *See, e.g.*, *Balentine v. Thaler*, 626 F.3d 842, 847-48 (5th Cir. 2014). Thus, whether litigation on this issue ultimately allows Mitchell to re-open his habeas proceedings does not provide justification to deny the motion, or to find that it is simply a second or successive petition in disguise.

Instead, the key issue is whether the denial of Mitchell's motion to interview jurors addresses a non-merits aspect of his first federal proceeding. Respondent previously agreed that the denial of the motion in district court was a procedural ruling. By now arguing otherwise, Respondent ignores a key holding of *Gonzalez*: determining whether a Rule 60(b) motion is a second or successive habeas petition is "relatively simple." 545 U.S. at 532. As the *Gonzalez* Court noted, "If neither the motion itself nor the federal judgment from which it seeks relief substantively addresses federal grounds for setting aside the movant's conviction, allowing the motion to proceed as denominated creates no inconsistency with the habeas statute or rules." *Id.* Respondent's position creates a conflict between Rule 60(b) and § 2255(h) where none actually exists.

## B. The District Court Abused Its Discretion in Denying Mitchell's Rule 60(b)(6) Motion

### 1. Barring criminal defendants from access to their trial jurors, particularly in death penalty cases, thwarts the goals of *Peña-Rodriguez*

Respondent claims that *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017), did not create a constitutional right to "interrogate" jurors absent evidence of misconduct. Rather, the case merely carved out a limited exception to Federal Rule of Evidence Rule 606(b), because it still requires a juror "to make a clear statement that he or she relied on racial stereotypes or animus to convict a criminal defendant" before the no-impeachment rule can give way to protect a defendant's Sixth Amendment jury trial guarantee. (Dkt. 21 at 28.) Therefore, according to Respondent, federal district court rules which demand a showing of good cause—i.e., something akin to a "clear statement" that racism infected the jury's resolution of the case—remain permissible in a post-*Peña-Rodriguez* world. (*Id.*) These arguments are based on an unduly restrictive reading of *Peña-Rodriguez* that ignores the scope and import of the opinion.

*Peña-Rodriguez* held that Rule 606(b), and its state equivalent, cannot bar evidence of racial animus, "a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice." 137 S. Ct. at 868. The Court specifically pointed to the "unique historical, constitutional, and institutional concerns" implicated by racial bias, and recognized that the typical safeguards

utilized to protect the right to an impartial jury (such as voir dire, juror questionnaires, and observation of juror conduct during trial) "may prove insufficient" to reveal racist attitudes. *Id.* at 868-69. Thus, in recognition of the unique and uniquely harmful role racism has played in our society, and the difficulties of discovering it when it exists, the Court sanctioned the creation of "[a] constitutional rule that racial bias in the justice system must be addressed." *Id.* at 869.

Respondent insists that *Peña-Rodriguez* is a "narrow" holding that neither creates a right to interview jurors nor provides extraordinary circumstances to support Rule 60(b) relief.[2] (Dkt. 21 at 28.) Contrary to Respondent's assertion, however, *Peña-Rodriguez* is a landmark decision. As one justice noted, the majority opinion is a "startling development" that drastically changes "the age-old" no-impeachment rule, such that "it is doubtful that there are principled grounds for preventing the expansion of [that] holding." *Peña-Rodriguez*, 137 S. Ct. at 874 (Alito, J., dissenting). This holding is undoubtedly inconsistent with local rules barring a petitioner from investigating racial bias amongst jurors unless they already have evidence of that bias. Nevertheless, Respondent maintains that *Peña-*

---

[2] It should be noted that in the opposition to Mitchell's motion to interview jurors, Respondent argued that the "controlling authority" barring Mitchell's request was Federal Rule of Evidence 606(b). 2ER 142. *Peña-Rodriguez* has obviously upended that ground for denying relief.

*Rodriguez*'s reference to a "clear statement" that a juror relied on racial stereotypes means that a defendant must first obtain proof of racial animus in order to interview jurors in those jurisdictions where good cause is required. (Dkt. 21 at 28-29.) Therefore, the question that arises is *how* a defendant can investigate and present such evidence in order to protect his Sixth Amendment right to a jury trial untainted by racism.

*Peña-Rodriguez* countenances two possibilities. First, the Court acknowledged that "[t]he practical mechanics of acquiring and presenting such evidence will no doubt be shaped and guided by state rules of professional ethics and local court rules, both of which often limit counsel's post-trial contact with jurors." *Peña-Rodriguez*, 137 S. Ct. at 859-60. But rules like Local Rule 39.2 fail to set forth "practical mechanics"; instead, by requiring clear evidence of racism before juror interviews can take place, they operate as an all-out ban on a defendant's ability to investigate juror misconduct. Thus, one approach is to eliminate the good cause standard in order for *Peña-Rodriguez* to have any practical effect. (*See* Dkt. 13 (AOB) at 16-19.)

A second approach would be to allow the good cause requirement, but find that the need to ferret out racism satisfies that standard. As Mitchell discussed in his opening brief (Dkt. 13 at 32), only two—the District of Arizona and the District of Montana—require a "good cause" showing. D. Ariz. Loc. Civ. R. 39.2(b); D.

Ariz. Loc. Crim. R. 24.2; D. Mont. Loc. Civ. R. 48.1(b); D. Mont. Loc. Crim. R. 24.2(b). In carving out a notable exception to the longstanding no-impeachment rule, the *Peña-Rodriguez* Court emphasized that "[d]iscrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice" and must be eliminated. *Id.* at 868 (quoting *Rose v. Mitchell*, 443 U.S. 545, 555 (1979)); *see also Buck*, 137 S. Ct. at 778 (same). Juror investigations designed to disclose racial discrimination should be sufficient to overcome any judicial restrictions, including a showing of good cause. Otherwise, defendants in the District of Arizona are arbitrarily barred from conducting a reasonable investigation. As Mitchell discussed in his opening brief, this inequity flies in the face of core death penalty principles regarding "arbitrariness," in that a defendant's ability to investigate is based on where he happens to be tried, and "heightened reliability," in that Mitchell is precluded from investigating whether his convictions and death sentences were impacted by racial bias.[3] *Furman v. Georgia*, 408 U.S. 238 (1972); *Woodson v. North Carolina*, 428 U.S. 280 (1976).

---

[3] Ironically, Respondent dismisses Mitchell's reliance on *Furman* and *Woodson*, two pillars of capital case jurisprudence, by arguing that "the pressures of death penalty litigation do not permit us to depart from established jurisprudence." (Dkt. No. 21 at 34 (quoting *Jones v. Ryan*, 733 F.3d 825, 846 (9th Cir. 2013)). It is without question that, under the Eighth Amendment, "the penalty of death is different in kind from any other punishment" and therefore is deserving of a higher level of scrutiny. *Gregg v. Georgia*, 428 U.S. 153, 188 (1976); *see also Herrera v. Collins*, 506 U.S. 390, 405 (1993) (discussing the longstanding Eighth

Under either approach, Respondent's concerns about the sanctity of the deliberative process and potential harassment of jurors (Dkt. 21 at 26, 49-50) would be unlikely to come to pass. *See Peña-Rodriguez*, 137 S. Ct. at 870 (discussing how jurisdictions that recognize a racial bias exception to Rule 606(b) exhibit "no signs of an increase in juror harassment or a loss of juror willingness to engage in searching and candid deliberations."). And it should be beyond dispute that the constitutional rights of death-sentenced individuals take precedence over judicially-created rules to designed to protect jurors. Constitutional rights implicitly protect those closely-related acts necessary to their exercise. *Luis v. United States*, 136 S. Ct. 1083, 1097 (2016) (Thomas, J. dissenting). Inevitably, "[t]here comes a point . . . at which the regulation of action intimately and unavoidably connected with [a right] is a regulation of [the right] itself." *Hill v. Colorado*, 530 U.S. 703, 745 (2000) (Scalia, J., dissenting). The Supreme Court has applied this principle in a number of cases. For example, because criminal defendants have a right to an initial appeal, the Court has determined that defendants must also have the right to counsel for that appeal, or else the appellate right is diminished. *Douglas v. California*, 372 U.S. 353 (1963). And later, continuing this trend, the Court held that if defendants on appeal have a right to

---

Amendment right to "increased reliability" of the process by which capital punishment may be imposed).

counsel, then that right must encompass the effective assistance of appellate counsel. *Evitts v. Lucey*, 469 U.S. 387 (1985). The same logic applies here: If criminal defendants have the constitutional right to present evidence that racial animus affected the verdict, they must be given the tools to investigate that evidence. By placing Mitchell in a Catch-22—to establish racial bias, he must investigate; to be permitted to investigate, he must establish racial bias—the district court abused its discretion.

### 2. *Peña-Rodriguez* establishes that traditional safeguards against racial bias are lacking, and the district court abused its discretion in finding that those safeguards provided adequate protection in this case

In *Tanner v. United States*, 483 U.S. 107, 127 (1987), the Supreme Court outlined traditional safeguards designed to protect a defendant's right to an impartial and competent jury beyond post-trial juror testimony, including voir dire, observation of jurors during trial, and pre-verdict opportunities for juror misconduct to be disclosed. According to Respondent, *Peña-Rodriguez* did not find those longstanding safeguards inadequate to root out racism in criminal trials. Rather, *Peña-Rodriguez* "simply said that those protections do not prevent courts from considering evidence of racial bias 'where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant.'" (Dkt. 21 at 29 (quoting *Peña-Rodriguez*, 137 S. Ct. at 869).) Additionally, Respondent claims that the "safeguards against racial bias in this

case were sufficient to ensure Petitioner's right to a fair trial," as those protections "went far beyond what is typical." (*Id.*) Therefore, Respondent argues, the district court did not abuse its discretion in relying on the *Tanner* safeguards and finding that Mitchell did not establish good cause to interview his jurors. (*Id.*) Respondent's position is a mischaracterization of the *Peña-Rodriguez* holding and is belied by the record.

*Peña-Rodriguez* acknowledged that courts have traditionally relied on certain safeguards to protect the right to an impartial jury, and that "[s]ome of those safeguards . . . can disclose racial bias." 137 S. Ct. at 868. However, the "distinct" and "unique" aspects of racism also mean that those safeguards "may be compromised, or they may prove insufficient." *Id.* As a result, "there is a sound basis to treat racial bias with added precaution." *Id.* at 869. This is because "the stigma that attends racial bias may make it difficult," in the context and formality of voir dire or a trial, for a juror to admit their own bias, or to report inappropriate statements during the course of juror deliberations. *Id.* Thus, the Court held, it is necessary to create a "constitutional rule that racial bias in the justice system must be addressed—including, in some instances, after the verdict has been entered" in order to "prevent a systemic loss of confidence in jury verdicts." *Id.*

Respondent makes much of the fact that the jurors in Mitchell's trial were specifically asked about race during voir dire and in juror questionnaires, which

Respondent described as "extraordinary, exhaustive, and individualized." (Dkt. 21 at 35.) A review of the record, however, shows that this description is exaggerated at best. During voir dire, the jurors were asked just one question about race: "The defendant in this case is Native American. Have you had any experience with members of any race, creed, or color, specifically Native Americans, that would prevent you from being fair and impartial in this case?" (*See, e.g.*, CR 266.) The juror questionnaire asked a similar question, in addition to questions about whether the venireperson was Native American or had relatives or close contacts with Native Americans. *See* CA No. 11-99003, Sealed Excerpts of Record Volumes I-II. But beyond the fact that the queries specifically mentioned "Native Americans," they were not much more than "[g]eneric questions about juror impartiality [which] may not expose specific attitudes or biases that can poison jury deliberations." *Peña-Rodriguez*, 137 S. Ct. at 869; *see also Morgan v. Illinois*, 504 U.S. 719, 735 (1992) (general questions about prospective jurors' fairness and impartiality are not sufficient to satisfy the Constitution). Those questions, and the jurors' attestations that race played no part in their verdict, do not suffice to protect Mitchell or guarantee his Sixth Amendment right to a fair trial. And pre-trial venire does not expose racial bias that may have been prompted by events that occur during trial—including, for example, improper closing argument.

Respondent also argues that Mitchell "had no good cause to interrogate jurors because there has never been any hint of racial bias by any of them." (Dkt. 21 at 34.) Yet a review of the record shows that the defense was concerned about the potential for racism and bias to affect juror deliberations from the start of Mitchell's trial—otherwise, why would the supposedly "extraordinary, exhaustive, and individualized" questioning about race have been necessary? Those concerns were proven to be justified: Mitchell's trial was tainted by inaccurate media reporting, a dearth of Navajo members in the jury pool (and only one on the jury), and a prosecutorial closing argument "riddled" with inappropriate comments (some relating to religious beliefs and Navajo culture). *United States v. Mitchell*, 502 F.3d 931, 995 (9th Cir. 2007). Bias against Native Americans in the larger culture also made it more likely that jurors who sat in judgment of Mitchell harbored overt or latent racism. A 2014 study using data from the federal Centers for Disease Control showed that over a 12-year period from 2002 to 2014, Native Americans were statistically more likely to be killed by police than any other group, including African-Americans.[4] And as recently as the 1970s, Native Americans, including thousands of Navajos, were forced by the United States Government to attend

---

[4] Males, Mike, "Who Are Police Killing?", Center on Juvenile and Criminal Justice, Aug. 26, 2014, found at http://www.cjcj.org/news/8113 (last visited October 10, 2019).

Christian boarding schools as part of an official policy to "assimilate" indigenous persons into white culture.[5]

If the safeguards pointed to by Respondent and the district court were enough to expose racism before a jury verdict, then cases like *Peña-Rodriguez* would not exist. Yet in that case,

> members of the venire were repeatedly asked whether they believed that they could be fair and impartial in the case. A written questionnaire asked if there was "anything about you that you feel would make it difficult for you to be a fair juror." The court repeated the question to the panel of prospective jurors and encouraged jurors to speak in private with the court if they had any concerns about their impartiality. Defense counsel likewise asked whether anyone felt that "this is simply not a good case" for them to be a fair juror. None of the empaneled jurors expressed any reservations based on racial or any other bias. And none asked to speak with the trial judge.

*Peña-Rodriguez*, 137 S. Ct. at 861. Sadly, what happened in *Peña-Rodriguez* was not an isolated incident. In *Tharpe v. Sellers*, 138 S. Ct. 545 (2018), a white juror who served on Tharpe's capital jury was interviewed by defense counsel and attested, years after trial, that "'there are two types of black people: 1. Black folks and 2. [N------s]'; that [Petitioner], 'who wasn't in the "good" black folks category

---

[5] Tapahonso, Lucy, "For More Than 100 Years, the U.S. Forced Navajo Students Into Western Schools. The Damage Is Still Felt Today," Smithsonian Magazine, July 2016, found at https://www.smithsonianmag.com/history/decades-us-government-forcibly-placed-native-students-western-schools-effects-felt-today-180959502/ (last visited October 10, 2019).

in my book, should get the electric chair for what he did'; that '[s]ome of the jurors voted for death because they felt [Petitioner] should be an example to other blacks who kill blacks, but that wasn't my reason'; and that, '[a]fter studying the Bible, I have wondered if black people even have souls.'" 138 S. Ct. at 546. That juror made it through voir dire and a capital trial without the traditional "safeguards" exposing his extreme racism. Similarly, in *Rhines v. Young,* Case No. 18-2376 (8th Cir. 2018), a case about anti-gay bias, 11 of 12 jurors were specifically asked whether they harbored any homophobic beliefs or concerns about homosexuality that would impact their ability to be impartial, and all of them said no. Yet juror interviews conducted approximately 15 years after the trial revealed that during jury deliberations at least two jurors made anti-gay statements, and one used an anti-gay slur. *Tharpe* and *Rhines* illustrate *Peña-Rodriguez*'s central concern: that when it comes to certain kinds of deeply-rooted, deeply-damaging bias, traditional safeguards are often not enough to protect a defendant's Sixth Amendment right to an impartial jury. The district court abused its discretion in finding that those safeguards were sufficient to protect Mitchell at his capital trial.

### C. This Court Should Grant Mitchell's Rule 60(b) Motion

Respondent argues that neither the factors for granting Rule 60(b) relief under *Phelps v. Alameida*, 569 F.3d at 1133 (adopting standards set forth in *Ritter v. Smith*, 811 F.2d 1401 (11th Cir. 1987)) nor concerns about equity support relief

under Rule 60(b). Mitchell will not reiterate the entirety of his arguments for Rule 60(b) relief, but instead respectfully directs this Court to his opening brief. (Dkt. 13 at 25-30.) However, a few of Respondent's points require a reply.

Respondent argues that the discretionary law-of-the-case doctrine bars the Court from granting Mitchell's Rule 60 motion because Mitchell has failed to show that the prior decision meets the exceptions set forth in *Arizona v. California*, 460 U.S. 605, 618 (1983) (holding that a prior decision should be followed unless it is clearly erroneous and would work a manifest injustice, intervening controlling authority justifies departure from the decision, or substantially different evidence was adduced at a subsequent legal proceeding). Because Rule 60 allows for post-judgment relief from judgment or orders, however, Respondent's logic would dictate that no Rule 60 motion could be granted absent a law-of-the-case analysis, which is belied by Supreme Court precedent. *Christeson v. Roper*, 135 S. Ct. 891, 895-96 (2015) (stating that a petitioner must establish only timeliness and extraordinary circumstances to avail himself of relief under Rule 60).

Assuming arguendo that Respondent is correct, Mitchell has already discussed the import of *Peña-Rodriguez*, which constitutes "an intervening change in the law" that justifies departing from the law-of-the-case doctrine. *In re Rainbow Magazine, Inc.*, 77 F.3d 278, 281 (9th Cir. 1996). Respondent's emphasis on the need for finality, and the supposed lack of doubt about Mitchell's

guilt or eligibility for the death penalty (Dkt. 21 at 47), are straw man arguments that have no bearing on the question of whether Mitchell's trial was tainted by a racist jury. Mitchell has established the injustice of depriving him of an opportunity to interview the jurors (Dkt. 13 at 15-19, 25-33) which also warrants a departure from the law-of-the-case doctrine. *In re Rainbow Magazine, Inc.*, 77 F.3d at 281.

Respondent argues that Mitchell's motion to interview jurors was properly denied because of his "gross untimeliness." (Dkt. 21 at 46.) Respondent's position illustrates a serious problem with the local rule that Mitchell has been pointing out since he filed his motion: By requiring the motion to be filed within 14 days of the verdict,[6] it precludes *any* juror investigation during a petitioner's post-conviction proceedings. Again, this is in stark contrast to inmates on Arizona's death row, who are all permitted to interview jurors without the need for good cause as part of their state habeas litigation. Respondent's argument that some state habeas petitioners have been denied juror contact absent a preliminary showing of cause (*id.* at 52), is misleading. While some federal district court judges have indeed imposed that requirement in 2254 cases, those defendants had the opportunity in state habeas to interview jurors. The District of Arizona's

[6] *See* Fed. R. Crim. Procedure 33(b)(2).

timeliness requirement for interviewing jurors is yet another impediment to a habeas petitioner asserting his Sixth Amendment right to an impartial jury.

## II. CONCLUSION

The Court should vacate the district court's judgment, review Mitchell's motion in the first instance, and grant Mitchell relief under Rule 60(b)(6). The Court should then remand the case to the district court with instructions to allow Mitchell to interview the trial jurors in his case.

Respectfully submitted,

AMY M. KARLIN
Interim Federal Public Defender

DATED: October 11, 2019

By: */s/ Celeste Bacchi*
CELESTE BACCHI
JONATHAN C. AMINOFF
Deputy Federal Public Defenders

Attorneys for Movant-Appellant
LEZMOND CHARLES MITCHELL

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. 32(a)(7)(C) and Circuit Rule 32-1, I certify that this reply brief is proportionally spaced, has a typeface of 14 points or more, and contains approximately 5,286 words.

DATED: October 11, 2019

*/s/ Celeste Bacchi*
CELESTE BACCHI